******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LYME LAND CONSERVATION TRUST, INC.
*v.* BEVERLY PLATNER ET AL.
(SC 19797)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa, Robinson and Vertefeuille, Js.

*Argued February 21—officially released May 23, 2017*

*Brendon P. Levesque*, with whom was *Karen L. Dowd*, for the appellant (named defendant).

*John F. Pritchard*, pro hac vice, with whom were *Tracy M. Collins* and, on the brief, *Edward B. O'Connell*, for the appellee (plaintiff).

*Gary W. Hawes*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Jane R. Rosenberg*, assistant attorney general, for the appellee (intervening plaintiff).

*Opinion*

ROGERS, C. J. This case raises the questions of whether a conservation restriction on private property was violated by the owner of that property and, if so, whether the remedies ordered by the trial court were proper. The defendant Beverly Platner[1] appeals from the judgment of the trial court awarding legal and equitable relief to the plaintiff Lyme Land Conservation Trust, Inc.,[2] after concluding that the defendant had violated a conservation restriction granted to the plaintiff by a former owner of the defendant's property. The defendant claims that the trial court improperly found violations of the conservation restriction by misinterpreting it and improperly ordered relief that was either legally unauthorized or lacking in evidentiary support. We agree with the trial court's interpretation of the conservation restriction and its consequent finding that the defendant had violated it in multiple respects, and we see no impropriety with respect to the portion of the court's judgment awarding the plaintiff equitable relief. We agree with the defendant, however, that the court's award of punitive damages was noncompliant with the authorizing provision, General Statutes § 52-560a (d), and that its award of attorney's fees, in one respect, was improper. Accordingly, we affirm in part and reverse in part the judgment of the trial court.

The following facts, which either were found by the trial court or are not disputed, and procedural history are relevant to the appeal. The defendant is the owner of 66 Selden Road in Lyme (property). She purchased the property in May, 2007. By virtue of a "Declaration of Restrictive Covenants" (declaration) executed in 1981 by a former owner of the property and recorded in the Lyme land records, substantial portions of the property are protected by a conservation restriction, as defined by General Statutes § 47-42a.[3] The plaintiff is the owner of that conservation restriction.[4] The general purpose of the restriction, as stated in the declaration, is to "assure retention of the premises predominantly in their natural, scenic or open condition and in agricultural, farming, forest and open space use . . . ."[5]

The property, which borders on the Connecticut River, Selden Creek and Selden Cove, measures approximately 18.7 acres. It is comprised of a protected area of about 14.3 acres, which is subject to the conservation restriction, and an unprotected area of about 4.4 acres, which is not subject to the conservation restriction. The defendant's house is located on the unprotected area of the property. The protected area of the property includes a large open space to the north and west of the house (meadow) and a smaller forested area to the south of the house (woodlands).

Fleur Hahne Lawrence, who sold the property to the defendant and, before that, had owned it since 1997,

had maintained the meadow by mowing it twice a year, once at the end of July when birds had finished nesting and again around Thanksgiving. A previous owner had agreed to a similar mowing regimen. Lawrence also had four or five trees removed from the woodlands after they had been damaged by beavers, but otherwise did not cut or mow there. Lawrence had employed Novak Brothers Landscaping (Novak) to do landscaping work, but only in the unprotected area around the house. Lawrence's limited activities in the protected area were consistent with the plaintiff's view of the declaration.

After purchasing the property, the defendant also employed Novak for landscaping work, but she did not contain that work to the unprotected area. Beginning in 2007, and continuing over the next few years, the defendant began mowing the entire meadow area frequently, sometimes twice a week. She also installed an irrigation system in the meadow. The defendant added topsoil to the meadow, aerated it, and hydroseeded and slice seeded it with grass seed typically used for residential lawns. She retained a plant health care contractor who applied lime, fertilizers, fungicides, herbicides and pesticides to the meadow. Ultimately, the grasses previously existing in the meadow were eliminated and replaced with the new grasses planted by the defendant.

The defendant also planted many ornamental shrubs, plants and flowers throughout the meadow. She created "tree rings" to house some of these plantings by removing truckloads of grass and soil from around trees in the meadow. In the woodlands, the defendant engaged in mowing the understory.[6] After obtaining a permit from the Lyme Inland Wetlands Commission, the defendant, over the plaintiff's objections, relocated her driveway. The new driveway, in part, encroached on the protected area. Finally, the defendant spread sand to create an artificial beach in a portion of the protected area that bordered the Connecticut River.

The plaintiff was aware of the foregoing activities and, for a time, attempted to persuade the defendant that they were not permitted by the declaration. Those efforts were not successful. On October 14, 2009, the plaintiff filed this action, initially seeking a declaratory judgment as to the parties' rights under the declaration. It subsequently amended its complaint to allege actual or intended violations of the declaration. Specifically, in its second amended complaint dated January 15, 2013, the plaintiff averred that the defendant, contrary to the terms of the declaration, had: constructed a driveway in the protected area; cut and thinned the woodlands understory; destroyed existing native grasses and vegetation in the protected area and replaced them with lawn and ornamental landscaping; installed an irrigation system in the protected area; and dumped truckloads of dirt in the protected area. The plaintiff alleged

further that those activities constituted a wilful violation of § 52-560a.[7] It requested as relief, inter alia, an injunction barring the defendant from further violations and requiring restoration of the property to its earlier condition, as well as statutory damages and attorney's fees pursuant to § 52-560a. See General Statutes § 52-560a (c) and (d); see also parts IV and V of this opinion.

Following a bench trial, the trial court, *Hon. Joseph Q. Koletsky*, judge trial referee, held that the defendant deliberately had violated the restrictions set forth in the declaration, which were unambiguous, and, further, that she had violated § 52-560a. In the court's view, the defendant had "destroy[ed]" the protected area on the property, with the "intent . . . to incorporate the [protected] area into the [unprotected] area for aesthetic purposes as [she] desired . . . without regard to those restrictions," thereby making the protected and unprotected areas "indistinguishable." The court described the defendant's actions of mowing and seeding the meadow until it eventually resembled a lawn, and opined that those "actions were wilful and caused great damage to the protected area's natural condition, which the defendant was obligated to retain." The court further noted the defendant's "extensive landscaping of all of the protected area," which included, for example, the placement of tons of soil and sand, as well as "huge amounts of fertilizer," thereon. As to the woodlands, the court was of the opinion that the defendant had not simply mowed grass, but rather, had "destroyed considerable [and diverse] vegetation . . . ." According to the court, the defendant, by selectively reading language in the declaration in isolation to justify her actions, had "completely subvert[ed] and eviscerate[d] the clear purpose of the conservation restriction." Consequently, the court awarded the plaintiff damages of $350,000 pursuant to § 52-560a (d), as well as attorney's fees of $300,000.

The court also ordered injunctive relief, specifically, that the defendant restore the property to the condition that had existed prior to her taking ownership of it. After holding an additional hearing at which various experts testified, the court outlined the particulars of that restoration, which included: cessation of frequent mowing in the meadow and replanting it with small plant " 'plugs' " or similar devices to restore it to a natural state not requiring chemical fertilizers; removal of the heads from the irrigation system in the meadow to render it nonfunctional; removal of the tree rings; discontinuation of mowing in the woodlands to return them to their earlier, natural condition; and remediation of the artificial beach created by the defendant. After a further hearing at which the parties submitted more specific planting plans, the court ordered the defendant to comply with the plan that had been submitted by the plaintiff. The court also accepted the parties' stipulation regarding a "land swap" as a remedy for the encroach-

ment on the protected area by the defendant's relocated driveway, the impropriety of which the court had deemed unquestionable.[8] This appeal followed.[9]

I

The defendant claims first that the trial court improperly concluded that she had violated § 52-560a (b), which disallows encroachment on a conservation easement "without . . . legal authorization," because the activities that she undertook in the protected area were authorized by the declaration. She contends that the court misinterpreted and misapplied the terms of the declaration to conclude otherwise. In the defendant's view, the plain language of the declaration did not prohibit her conduct but, to the contrary, expressly permitted it. We do not agree.

We begin with the standard of review and applicable legal principles. To determine whether the defendant's activities constituted a violation of the conservation restriction and, by extension, a violation of § 52-560a (b), we look to the language of the declaration that created that restriction. Our review of the trial court's construction of that document is plenary. *Wykeham Rise, LLC* v. *Federer*, 305 Conn. 448, 457, 52 A.3d 702 (2012). To determine what the declaration allows or disallows, we "must consider the language and terms of [that] instrument as a whole. . . . Our basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed or other conveyance, and that it shall, if possible, be so construed as to effectuate the intent of the parties. . . . In arriving at the intent expressed . . . in the language used, however, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence." (Internal quotation marks omitted.) Id., 456–57.

At the same time, however, when a restrictive covenant is expressed without ambiguity, it will be given effect according to its terms. *Morgenbesser* v. *Aquarion Water Co. of Connecticut*, 276 Conn. 825, 829, 888 A.2d 1078 (2006). "[C]ontractual terms are to be given their ordinary meaning and when the intention conveyed is clear and unambiguous, there is no room for construction." (Internal quotation marks omitted.) *Gino's Pizza of East Hartford, Inc.* v. *Kaplan*, 193 Conn. 135, 138, 475 A.2d 305 (1984).

The declaration is comprised of an introductory section, which indicates that the declaration is in favor of, and enforceable by, the plaintiff as the grantee, and four enumerated articles. Article I is captioned, "Restrictions," and lists a number of things that are not permitted in the protected area.[10] Article II is captioned, "Reservations," and lists a number of rights that, "[*a*]*ny*-

*thing in ARTICLE I above to the contrary notwith-standing,* the [g]rantor reserves to himself and his heirs and assigns . . . ."[11] (Emphasis added.) Article III contains miscellaneous provisions that, aside from the general purpose of the restriction previously stated; see footnote 5 of this opinion; are not relevant to the question at hand, and article IV concerns amendment of the declaration.

The defendant argues that the preliminary language to the reservations in the declaration, emphasized in the foregoing paragraph, makes clear that those reservations take precedence over the restrictions; in other words, if an owner of the property is engaged in one of the activities listed in the reservations, it is of no moment that such activity violates one or more of the restrictions. The plaintiff does not dispute this construction, and we agree that the language used and structure of the declaration plainly and unambiguously support it.[12] Additionally, nothing expressly stated in the trial court's memoranda of decision indicates that the trial court reasoned otherwise. Accordingly, to establish that the court improperly allowed the restrictions in the declaration to trump the reservations, the defendant must show that the activities that the court found to be violations, although contrary to the restrictions, nevertheless were encompassed by the reservations. This she has not done.

To reiterate, the trial court found that the defendant improperly had placed tons of topsoil in the meadow to facilitate the growing of grass and tons of sand in an area along the riverfront to create an artificial beach, and that she improperly had created tree rings in the meadow. These activities clearly violated, respectively, the restriction set forth in § 1.2 of the declaration, which provides in relevant part that "[*n*]*o soil*, loam, peat, *sand*, gravel, rock or other mineral substance . . . *will be placed*, stored or permitted to remain" upon the protected area, and that set forth in § 1.3 of the declaration, which provides that "[*n*]*o soil*, loam, peat, sand, gravel, rock, mineral substance or other earth product or material *shall be excavated or removed*" from the protected area. (Emphasis added.) The court found further that the defendant had engaged in extensive mowing and seeding in the meadow, accompanied by the installation of an irrigation system and application of huge amounts of fertilizer, in order to eliminate the existing meadow grasses and replace them with a residential type lawn similar to that in the unprotected area.[13] These activities clearly violated the restriction set forth in § 1.4 of the declaration, which provides that "[*n*]*o* trees, *grasses or other vegetation* thereon *shall be cleared or otherwise destroyed*." (Emphasis added.) As to the woodlands, the court concluded that the defendant had destroyed considerable and diverse vegetation in the understory.[14] This activity clearly ran afoul of the proscription in § 1.4 against the destruction of

vegetation, as well as of the restriction set forth in § 1.7 of the declaration, which requires, with an exception not applicable here, that "all woodland [in the protected area] shall be kept in a state of natural wilderness." Finally, there is no dispute that the defendant's relocation of her driveway over a portion of the protected area is contrary to the restriction set forth in § 1.1 of the declaration, which bars the placement of various temporary or permanent structures in the protected area.

The question remains whether the foregoing activities were, nevertheless, permitted by an article II reservation. The trial court acknowledged the only arguably applicable one, set forth in § 2.2 of the declaration, and opined, in short, that the defendant had focused myopically, and unjustifiably, on one phrase therein to defend the bulk of her activities in the protected area. Section 2.2 provides that, notwithstanding the restrictions of article I, the defendant retains the right "[t]o conduct and engage in the cultivation and harvesting of crops, flowers and hay; the planting of trees and shrubs and *the mowing of grass*; the grazing of livestock; and the construction and maintenance of fences necessary in connection therewith." (Emphasis added.) As indicated, the phrase on which the defendant had focused, and continues to focus, is "mowing of grass." As should be obvious, and as the trial court concluded, the defendant's activities in the protected area went well beyond the "mowing of grass." Had the defendant simply mowed grass, there might be, as the trial court allowed, a valid claim that she had not knowingly violated the declaration. Instead, however, the defendant's mowing in the meadow was incidental to another activity that most assuredly was *not* permitted by § 2.2 or any other reservation, namely, the installation of a residential lawn. And, as the trial court found, her mowing in the woodlands was not limited to grass, as permitted by the reservations, but rather, extended to the larger plant life existing in the understory. As to the defendant's other activities that clearly violated the restrictions—the encroaching driveway and the placement of sand and topsoil—the defendant does not even attempt to explain how they are saved by the reservations.[15]

The defendant contends additionally that the trial court improperly added restrictions that were not stated expressly in the declaration. In the defendant's view, because the declaration did not explicitly disallow fertilizing, planting new grass or irrigation, she did not violate it by engaging in those activities. This argument is meritless. First, all of the cited activities were improper because they were intended to destroy, and in fact did destroy, the grasses and other vegetation in the protected area in violation of § 1.4 of the restrictions. See footnote 10 of this opinion. It is irrelevant that the methods of destruction were not described with particularity in the declaration, as the destruction

itself clearly was prohibited. Second, none of those activities are allowed, nevertheless, due to their inclusion in §§ 2.1 through 2.4 of the reservations, which detail particular rights that are retained for the property's owner. See footnote 11 of this opinion. Finally, as to additional rights that are not explicitly reserved, the final reservation set forth in § 2.5 of the declaration makes abundantly clear that the owner may "continue the use of the [p]rotected [a]reas for all purposes *not inconsistent with the restrictions set forth in ARTICLE I above*." (Emphasis added.) Because the cited activities were wholly inconsistent with the prohibition on the destruction of grass and other vegetation, they are not saved by § 2.5. For the foregoing reasons, the defendant's claim that the trial court improperly interpreted and applied the terms of the declaration fails.

## II

The defendant claims next that the trial court lacked authority to order a restoration plan as part of its award of relief. According to the defendant, neither the declaration nor General Statutes § 47-42c or § 52-560a provides a basis for the court's remedy. In the defendant's view, the court's only option was to order that the property be returned to the precise condition it was in prior to her violations of the declaration, which included the presence of invasive, nonnative species, whereas the plan approved by the court aimed to recreate more natural conditions generally and omitted such species. We are not persuaded.

As previously explained, our review of the trial court's construction of the declaration is plenary; see *Wykeham Rise, LLC* v. *Federer*, supra, 305 Conn. 457; as is our review of the court's interpretation of a statute. *Santorso* v. *Bristol Hospital*, 308 Conn. 338, 355, 63 A.3d 940 (2013). In interpreting a statute, we are guided by the strictures of General Statutes § 1-2z.[16]

There are three potential sources for the court's authority to order the relief that it did. Section 3.5 of the declaration provides in relevant part "that a breach of this covenant in respect of any restriction herein set forth *may be enforced by the* [*plaintiff*] *by injunctive relief* . . . ." (Emphasis added.) Similarly, § 47-42c provides in relevant part that conservation restrictions "may be enforced *by injunction or proceedings in equity*. . . ." (Emphasis added.) Finally, § 52-560a (c), which authorizes actions by holders of conservation easements against parties who encroach on those easements, provides in relevant part that, if the plaintiff prevails, "the court may award reasonable attorney's fees and costs *and such injunctive or equitable relief as the court deems appropriate*." (Emphasis added.)

By broadly allowing for injunctive and equitable relief, the declaration and the two statutes clearly and unambiguously support the propriety of the trial court's

order. An injunction is an order for a party to do "some specified act or . . . to undo some wrong or injury"; Black's Law Dictionary (6th Ed. 1990); and is an equitable remedy whose issuance depends on a balancing of the equities between the parties. *Hartford Electric Light Co.* v. *Levitz*, 173 Conn. 15, 21, 376 A.2d 381 (1977). Similarly, a court's power to order equitable relief is broad and flexible. "[C]ourts exercising their equitable powers are charged with formulating fair and practical remedies appropriate to the specific dispute. . . . In doing equity, [a] court has the power to adapt equitable remedies to the particular circumstances of each particular case. . . . [E]quitable discretion is not governed by fixed principles and definite rules . . . . Rather, implicit therein is conscientious judgment directed by law and reason and looking to a just result." (Citations omitted; internal quotation marks omitted.) *Wall Systems, Inc.* v. *Pompa*, 324 Conn. 718, 736, 154 A.3d 989 (2017). Here, the court entered a common-sense order that directed the property to be remediated in a way that would approximate its earlier condition, but absent elements that all parties considered to be undesirable. This order was well within the court's authority.

The defendant ignores these broad grants of power to fashion appropriate relief and instead focuses on other language in § 52-560a (c) that directs courts to order the restoration of land to its prior condition, arguing for a strict construction of that language. Section 52-560a (c), however, authorizes injunctive and equitable relief "[i]n addition" to that remedy, and § 47-42c and the declaration provide independent authority for such relief. Consequently, the defendant's claim fails.

### III

The defendant claims additionally that aspects of the restoration plan ordered by the trial court lacked sufficient evidentiary support. Specifically, she contends that there was no evidence of the condition of the property in 2007 to provide a benchmark for the remediation, nor was there adequate proof that she had placed sand in the beach area, so as to justify the order that that area be remediated. We disagree.

The defendant's claim challenges the trial court's factual findings. "[T]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *CCT Communica-*

*tions, Inc.* v. *Zone Telecom, Inc.*, 324 Conn. 654, 673–74, 153 A.3d 1249 (2017).

Because factual findings and credibility determinations are squarely within the trial court's purview, we afford them great deference. *Connecticut Light & Power Co.* v. *Proctor,* 324 Conn. 245, 259, 152 A.3d 470 (2016). "In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) Id. Finally, a finding is not clearly erroneous merely because it relies on circumstantial evidence. See *Rawls* v. *Progressive Northern Ins. Co.*, 310 Conn. 768, 777, 83 A.3d 576 (2014) ("there is no distinction between direct and circumstantial evidence so far as probative force is concerned" [internal quotation marks omitted]). "[T]riers of fact must often rely on circumstantial evidence and draw inferences from it. . . . Proof of a material fact by inference need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact." (Internal quotation marks omitted.) *Palkimas* v. *Fernandez*, 159 Conn. App. 129, 133, 122 A.3d 704 (2015). In short, the court, as fact finder, "may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Buhl*, 321 Conn. 688, 711–12, 138 A.3d 868 (2016).

At trial, the plaintiff presented the expert testimony of, and a report prepared by, Glen Dreyer, a botanist. Dreyer opined both as to the probable conditions on the property in 2007 and the best way to restore the property to those conditions. He disclosed the resources he had consulted to arrive at the former determination, which included: historical maps and photographs from various years preceding 2007; a report from a November, 2007 site inspection of the property by an environmental consultant hired by the plaintiff; his examination of the plant life existing on land adjacent to the defendant's property and his more than thirty years of experience of observing vegetation in southeastern Connecticut. Some of the material on which Dreyer relied also was in evidence, as well as photographs of the property taken by representatives of the plaintiff during a fall, 2007 site visit. Because the trial court properly could have credited Dreyer's testimony, his report and the other evidence, and made reasonable inferences therefrom, its findings as to the condition of the property in 2007, on which its remediation order was based, were not clearly erroneous. See *In re Nevaeh W.*, 317 Conn. 723, 737, 120 A.3d 1177 (2015) (trial court free to believe or disbelieve expert testimony, in whole or in part, when making own independent determina-

tion of issue). To the extent the defendant contends that the plaintiff was required to provide a complete inventory of every plant species existing in the protected area in 2007, we disagree that the plaintiff's burden of proof in this civil action was so onerous.

As to the artificial beach that the trial court ordered remediated, an invoice from Novak in evidence indicates that, on August 3, 2007, twenty-two and one-half tons of sand was delivered to the property and, further, that Novak employees performed the following labor: "*Weeded beach and spread sand*, trimmed grapevine, backfilled bluestone walkway and trimmed dead wood." (Emphasis added.) Separately authored reports of a November, 2007 site visit by a representative of the plaintiff and the plaintiff's environmental consultant both indicated that the preexisting natural beach had been expanded landward by twenty-five to thirty feet beyond the river's high tide line. A photograph taken at that visit, when compared with an aerial photograph taken earlier in 2007, appears to support this assessment. Taken together, this evidence provides adequate support for the court's finding that extra sand had been deposited on the beach.

The defendant attempts to undermine this evidence by quoting selectively from the testimony of the owner of Novak and that of her husband, but it is clear from a fuller examination of that testimony that neither man truly knew where the sand had been spread and, to the extent they speculated that it was elsewhere, they did not even agree on an alternative location. Accordingly, we conclude that the defendant has not met her burden of showing that the trial court's finding on this issue was clearly erroneous. For the foregoing reasons, the defendant's third claim fails.

IV

The defendant next challenges the trial court's award of attorney's fees pursuant to § 52-560a (c) and the declaration. She claims that the attorney's fees award improperly includes amounts that the plaintiff incurred in separate proceedings before the Lyme Inland Wetlands Commission (commission) and an appeal taken therefrom, as well as in the prosecution of a claim for declaratory relief at the inception of this litigation that it subsequently withdrew. We agree with the defendant in part.

The following additional procedural history is relevant. As previously stated, the plaintiff filed this action on October 14, 2009, initially seeking a declaratory judgment on certain questions pertaining to the conservation restriction and the protected area. On January 9, 2010, the defendant filed an application with the commission seeking to relocate her driveway in a manner that would encroach, in part, on the protected area. The plaintiff appeared before the commission and

opposed the defendant's application, but on April 21, 2010, the commission granted the application. The plaintiff thereafter appealed from the commission's decision pursuant to General Statutes § 8-8, but withdrew that appeal in November, 2010, because the construction of the driveway was complete. On June 9, 2011, the trial court, *Cosgrove, J.*, permitted the plaintiff to file an amended complaint withdrawing its declaratory judgment claim and instead seeking injunctive and other relief for actual violations of the declaration, as previously described. The plaintiff ultimately prevailed on the amended complaint.

In addition to equitable relief and damages, the trial court awarded the plaintiff attorney's fees of $300,000, which included approximately $12,000 attributable to the proceedings before the commission and the appeal therefrom, and approximately $18,000 attributable to the present action prior to the amendment of the complaint. It cited both § 52-560a (c) and the declaration as authority for that award, and, over the defendant's objections, concluded that the fees incurred in the proceedings involving the commission and those arising from the declaratory judgment portion of the present case both fell within their purview. In the court's view, the plaintiff initially had attempted to resolve the matter amicably, but the defendant's increasing encroachment activities had required a change in strategy.

On appeal, the defendant contends that the award of attorney's fees should have been limited to those fees attributable to the portion of the present action postdating the amendment of the complaint, during which the plaintiff sought injunctive relief and damages. We agree with the defendant to a limited degree. Specifically, we conclude that the court improperly included in its award attorney's fees attributable to the proceedings involving the commission, but properly included in that award fees attributable to the declaratory judgment portion of this action.

This court reviews a trial court's decision to award attorney's fees for an abuse of discretion. *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 282 Conn. 576, 582, 923 A.2d 697 (2007). "This standard applies to the amount of fees awarded . . . and also to the trial court's determination of the factual predicate justifying the award. . . . Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) Id.

When it comes to attorney's fees, Connecticut follows the American rule. Id. Pursuant to that rule, "attorney's fees and ordinary expenses and burdens of litigation

are not allowed to the successful party absent a contractual or statutory exception." (Internal quotation marks omitted.) Id.

The trial court referenced both the declaration and § 52-560a (c) as authority for its award of attorney's fees. Section 3.6 of the declaration provides in relevant part: "If any action, whether at law or in equity, shall be brought to enforce the covenant arising pursuant to this declaration or to prevent an anticipatory breach thereof, and if any relief is granted in favor of the plaintiff in said action, the defendant . . . shall be obliged to pay all court costs and the reasonable attorneys' fees of the plaintiff therein . . . ."

We conclude that this provision is broad enough to encompass fees for the entire underlying action, both before and after the amendment of the complaint. Although the plaintiff initially sought to "prevent an anticipatory breach" of the declaration by obtaining a declaratory judgment, the defendant's increasing activities in the protected area ultimately required the plaintiff to seek "enforce[ment]" of the restrictive covenants included in the declaration via claims for equitable relief and damages. These various strategies were part and parcel of the same action, however, and the plaintiff clearly prevailed in "said action."

We agree with the defendant, however, that the fees incurred by the plaintiff when appearing before the commission, and appealing from the decision thereof, are not recoverable under § 3.6 of the declaration. The provision provides, in short, that a party may recover attorney's fees when it both (1) brings an action to enforce or prevent an anticipatory breach of the declaration, *and* (2) obtains relief "in *said action* . . . ." (Emphasis added.) In common parlance, " '[s]aid' means 'before-mentioned; already spoken of.' " *Trumbull Electric Mfg. Co.* v. *John Cooke Co.*, 130 Conn. 12, 15, 31 A.2d 393 (1943). Here, even assuming that the plaintiff's participation in, and appeal from, the commission proceedings all comprise the bringing of an action, as contemplated by the declaration, the plaintiff never obtained relief in *that* action, but ultimately withdrew it and chose to pursue relief in the present action instead. In short, the requirements for the recovery of fees pursuant to the declaration were unmet.

As to a possible statutory basis for the portion of the fee award attributable to the commission proceedings and the plaintiff's appeal therefrom, § 52-560a (c) provides in relevant part that a nonprofit land conservation organization, such as the plaintiff, that holds a conservation easement "may bring an action in the superior court . . . against any person who [encroaches on the easement] . . . . The court shall order any person who [encroaches on the easement] to restore the land to its condition as it existed prior to [the encroachment] . . . . In addition, *the court may award reasonable*

*attorney's fees and costs* and such injunctive or equitable relief as the court deems appropriate." (Emphasis added.)

This statute, by its plain terms and read as a whole, authorizes the holder of a conservation easement to bring an action against one who encroaches on the easement and contemplates the recovery of attorney's fees in *that* action. It cannot be fairly read to encompass fees incurred in an entirely separate administrative appeal brought pursuant to § 8-8. Because neither the declaration nor § 52-560a (c) authorizes the portion of the trial court's award of attorney's fees attributable to the proceedings before the commission and the appeal therefrom, that portion of the award was improper.

V

The defendant's final claim is that the trial court improperly awarded damages pursuant to § 52-560a (d).[17] According to the defendant, there was no evidence concerning the cost of the restoration plan that the court ultimately ordered, which is a necessary starting point for a calculation of damages under the statute. Relatedly, the defendant claims, the court improperly chose a fixed amount of damages, rather than one derived from actual restoration costs, in contravention of the plain terms of § 52-560a (d). We agree with the defendant that the court's damages award did not comply with § 52-560a (d).

The following additional procedural history is relevant. At trial, the plaintiff's expert witness, Dreyer, proposed a remediation plan that would restore the meadow to its previous condition by first removing the irrigation system and the lawn that the defendant had created, the latter through use of a sod cutter, then replanting the area with various native species and returning to an infrequent mowing regimen. As to the woodlands, Dreyer recommended the cessation of mowing so that the understory could be reestablished, and the planting of native shrubs. Dreyer estimated that his plan would cost between $90,000 and $100,000.

In its initial memorandum of decision issued shortly after the trial concluded, the trial court awarded the plaintiff damages of $350,000 pursuant to § 52-560a (d). The court credited Dreyer's estimate of $100,000, then applied a multiplier of three and one-half. Then, to encourage that the remediation be done properly even if the actual cost were to exceed Dreyer's estimate, the court further ordered "that this damage award be a fixed sum (or if the statute requires a precise multiplier, such a multiplier that will result in damages of $350,000) so that any increased costs that the defendant may wish to bear over what the court will require will not increase the damage amount." The court concluded its decision by ordering a further hearing to address the precise manner and timing of the restoration plan.

At the subsequent hearing, Dreyer made recommendations similar to those he had made at trial, and also advocated for removal of the beach sand, while experts presented by the defendant recommended a more passive approach, basically allowing the property to revert to a natural state by ceasing all landscaping activities. Concerns were raised about Dreyer's plan, particularly the potential for erosion of exposed soil and the need for regulatory permits. Following the hearing, the court did not adopt either party's recommendations in their entirety, but rather, took a hybrid approach that differed considerably from either party's plan. As to the meadow, the court ordered the planting of plugs rather than the removal of the existing turf, and then requested that the parties submit specific planting plans. Following the submission of those plans, the court ordered the defendant to comply with the plan submitted by the plaintiff. That plan did not include any cost estimate. The court did not alter its earlier award of statutory damages.

Because a trial court has broad discretion to determine whether damages are appropriate, we normally review a damages award only for a clear abuse of discretion. *Elm City Cheese Co.* v. *Federico*, 251 Conn. 59, 90, 752 A.2d 1037 (1999). To the extent the interpretation of a statute is at issue, however, our review is plenary. *Santorso* v. *Bristol Hospital*, supra, 308 Conn. 355.

Section 52-560a (c) authorizes a holder of a conservation easement, such as the plaintiff, to bring an action in Superior Court against one who encroaches on that easement and provides, further, that a party found to have encroached will be required to restore the property to its earlier condition. Subsection (d) of § 52-560a allows for additional damages and provides in relevant part: "In addition to any damages and relief ordered pursuant to subsection (c) of this section, the court may award damages of up to five times the cost of restoration or statutory damages of up to five thousand dollars. . . ." In awarding such additional damages, the court is directed to consider certain factors, including the wilfulness of the violation and the extent of the damage done to natural resources. General Statutes § 52-560a (d).

We conclude that the trial court's damages award, although unconventionally fashioned, was compliant with § 52-560a (d) at the time it initially was issued. In short, although the fixed award of $350,000 might have resulted in a statutory multiple that was imputed, rather than explicitly chosen, for the sake of flexibility, the award was anchored in the evidence that restoration costs would be $100,000 or more and, accordingly, did not run afoul of the statutory maximum ratio of punitive damages to actual damages. When the court later adopted a different restoration plan, however, with no evidence of its cost, its earlier award lost its mooring

and the ratio of punitive damages to actual damages became unknown. If the restoration plan ultimately ordered by the court costs less than $70,000 to implement, the court's award of $350,000 would include a punitive portion that exceeds the fivefold maximum authorized by § 52-560a (d). Upon remand, the trial court should take evidence as to the cost of the plan that it ordered and fashion a new damages award that is within the statutory parameters.

To summarize, the trial court properly interpreted the declaration and concluded that the defendant had violated it in multiple respects. The restoration plan ordered by the court was authorized by the declaration as well as by §§ 47-42c and 52-560a, and was predicated on factual findings having adequate evidentiary support. The attorney's fees awarded for the withdrawn declaratory judgment portion of this action were proper, but those awarded in connection with the separate proceedings before the commission, and the plaintiff's appeal therefrom, were improper. Finally, the court's award of statutory damages was not compliant with § 52-560a (d) and must be recomputed based on the costs of the actual restoration plan ordered.

The judgment is reversed as to the award of attorney's fees and damages pursuant to § 52-560a (d), and the case is remanded for a recalculation of attorney's fees and damages consistent with this opinion; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

[1] Also named as defendants in the original complaint were the two owners of certain property that is also subject to the conservation restriction at issue. The plaintiff subsequently withdrew the complaint as to those defendants and, for simplicity, we refer to Platner as the defendant.

[2] Attorney General George Jepsen was permitted to intervene as an additional party plaintiff in this action, pursuant to General Statutes § 52-107 and Practice Book § 9-18, to represent the public's interest in the conservation restriction at issue. See General Statutes § 47-42c (authorizing attorney general to bring action to enforce public interest in conservation and preservation restrictions); General Statutes § 52-560a (c) (authorizing attorney general to bring action for encroachment on conservation easement). For simplicity, we refer hereinafter to Lyme Land Conservation Trust, Inc., alone as the plaintiff.

[3] General Statutes § 47-42a (a) provides in relevant part: " 'Conservation restriction' means a limitation, whether or not stated in the form of a restriction, easement, covenant or condition, in any deed, will or other instrument executed by or on behalf of the owner of the land described therein . . . whose purpose is to retain land or water areas predominantly in their natural, scenic or open condition or in agricultural, farming, forest or open space use."

[4] Pursuant to General Statutes § 47-42c, conservation restrictions "are interests in land and may be acquired by any governmental body or any charitable corporation or trust which has the power to acquire interests in land in the same manner as it may acquire other interests in land. . . ."

[5] Section 3.3 of the declaration provides in relevant part: "The purpose of these restrictive covenants is to assure retention of the premises predominantly in their natural, scenic or open condition and in agricultural, farming, forest and open space use and to assure competent, conscientious and effective preservation and management in such condition and use. Said restrictions are intended as 'conservation restrictions' as that term is defined in [General Statutes §] 47-42a . . . ."

[6] Understory is defined as "the plants of a forest undergrowth" or, broadly, "an underlying layer of low vegetation." Webster's Ninth New Collegiate

Dictionary (1983).

[7] General Statutes § 52-560a provides in relevant part: "(b) No person may encroach . . . on open space land or on any land for which . . . a nonprofit land conservation organization holds a conservation easement interest, without the permission of the owner of such open space land or holder of such conservation easement or without other legal authorization. . . ." Pursuant to subsection (a) of § 52-560a, " 'encroach' means to conduct an activity that causes damage or alteration to the land or vegetation or other features thereon, including, but not limited to, erecting buildings or other structures, constructing roads, driveways or trails, destroying or moving stone walls, cutting trees or other vegetation, removing boundary markers, installing lawns or utilities, or using, storing, or depositing vehicles, materials or debris."

[8] Specifically, the plaintiff agreed that the driveway could remain in the protected area, and the defendant agreed that an additional parcel of formerly unprotected land would become subject to the conservation restriction. Prior to this agreement, the court had ordered that the encroaching portion of the driveway be removed and that the area be restored.

[9] The defendant appealed from the judgment of the trial court to the Appellate Court, and this court transferred the appeal to itself pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[10] The restrictions contained in article one of the declaration, in their entirety, are as follows:

"1.1. No building, sign, outdoor advertising display, mobile home, utility pole or other temporary or permanent structure will be constructed, placed or permitted to remain upon the [p]rotected [a]reas.

"1.2. No soil, loam, peat, sand, gravel, rock or other mineral substance, refuse, trash, vehicle bodies or parts, rubbish, debris, junk, or other waste material will be placed, stored or permitted to remain thereon.

"1.3. No soil, loam, peat, sand, gravel, rock, mineral substance or other earth product or material shall be excavated or removed therefrom.

"1.4. No trees, grasses or other vegetation thereon shall be cleared or otherwise destroyed.

"1.5. No activities or uses shall be conducted thereon which are detrimental to drainage, flood control, water conservation, erosion control, soil conservation, fish and wildlife or habitat preservation.

"1.6. No snowmobiles, dune buggies, motorcycles, all-terrain vehicles or other vehicles of any kind shall be operated thereon.

"1.7. Except as may otherwise be necessary or appropriate, as determined by the [g]rantee, to carry out beneficial and selective [noncommercial] forestry practices, all woodland thereon shall be kept in a state of natural wilderness.

"1.8. No hunting (as distinguished, in the opinion of the [g]rantee, from ecologically necessary or appropriate practices of animal population control) shall be carried on thereon.

"1.9. No boat centers, docks or other such landings shall be located or used thereon."

[11] The reservations contained in article II of the declaration, in their entirety, are as follows:

"2.1. To create and maintain views and sight lines from residential property of the [g]rantor by the selective cutting, pruning or trimming of vegetation, provided that such action shall not have a significant adverse impact upon the [p]rotected [a]reas.

"2.2. To conduct and engage in the cultivation and harvesting of crops, flowers and hay; the planting of trees and shrubs and the mowing of grass; the grazing of livestock; and the construction and maintenance of fences necessary in connection therewith.

"2.3. The cultivation and harvesting of forest products in accordance with sound [noncommercial] forestry practices.

"2.4. To maintain, repair, reconstruct and replace any utility poles and associated appurtenances thereto located upon the [p]rotected [a]reas at the effective date hereof.

"2.5. To continue the use of the [p]rotected [a]reas for all purposes not inconsistent with the restrictions set forth in ARTICLE I above."

[12] For this reason, we need not consult, as the parties suggest, the restriction's general purpose for further clarification. Because there is no ambiguity, we also need not reach the question, raised by the parties, of whether restrictive covenants creating conservation easements ought to be construed narrowly, in favor of promoting the free use of property, or more broadly, in favor of promoting public policy and protecting the expectations of the grantor and grantee.

[13] As to this point, the trial court explicitly credited the testimony of the

defendant's husband, whom the court previously found to be the defendant's agent, on his and the defendant's intentions: "[W]e began [in 2007] mowing the fields very, very regularly . . . by the end of two seasons, the field had turned into what we were looking to get it to turn into, which was primarily grass. . . . And in 2009, at that point, we began working on the grass field to move it into more of a lawn like the lawn [in the unprotected area], to give you a rough description. . . . In 2009, I know we had a big slice seeding project to, you know, strengthen the turf, and we also expanded the irrigation into that area to support the seeding that we were doing with the slice seeding."

[14] We reject the defendant's claim that her activities in the woodlands were limited to the removal of invasive species. There was conflicting evidence in this regard, and the trial court was free to credit the evidence that refuted the defendant's contention.

[15] We agree with the defendant that the reservation set forth in § 2.2 of the declaration expressly permitted the cultivation of flowers and the planting of shrubs and, therefore, that her activities in this regard were not disallowed by the declaration. The trial court, however, made no finding to the contrary.

[16] "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

[17] General Statutes § 52-560a (d) provides in relevant part: "In addition to any damages and relief ordered pursuant to subsection (c) of this section, the court may award damages of up to five times the cost of restoration or statutory damages of up to five thousand dollars. In determining the amount of the award, the court shall consider the willfulness of the violation, the extent of damage done to natural resources, if any, the appraised value of any trees or shrubs cut, damaged, or carried away . . . any economic gain realized by the violator and any other relevant factors."