PALMER, J.
**396 This appeal requires us to interpret and apply various statutory provisions that govern the casting of absentee ballots in a municipal primary election. On November 14, 2017, a special primary was held in the city of Bridgeport to nominate candidates from the Democratic party to run in the general election for two seats on the Bridgeport City Council. After the results of the Democratic special primary were determined, the plaintiff, Robert T. Keeley, Jr., a losing candidate, **397 challenged them pursuant to General Statutes § 9-329a,[1] claiming that several improprieties *1253 in the absentee balloting process had undermined the reliability of the outcome. Following an expedited hearing, the trial court agreed with three of the plaintiff's claims of impropriety and ordered, as a remedy, that a new special primary be held. The defendants, a winning candidate and certain city officials involved in the election process (city defendants),[2] thereafter filed with the trial court a reservation of four questions of law,[3] which that court certified and transmitted to this court for review pursuant **398 to General Statutes § 9-325.[4] The defendants also filed an appeal raising the same issues as those raised in the certified questions.[5] The defendants claim that the trial court improperly concluded that (1) *1254 General Statutes § 9-140b (a)[6] prohibits a party official or candidate from directing a police officer to retrieve absentee **399 ballots from electors and to deliver them to the town clerk, (2) certain absentee ballots were not "mailed," **400 as contemplated by § 9-140b (c), and (3) supervised absentee balloting at a certain nursing home did not comply with the statutory provisions governing that process. The defendants also claim generally that the trial court improperly allocated the burden of proof applicable to the proceedings, effectively placing on them the burden of disproving the plaintiff's allegations. We agree with the defendants' third claim but disagree with their remaining claims. Because the number of absentee ballots invalidated as a result of our disposition *1255 of the issues remains sufficiently high to place the reliability of the November 14, 2017 special primary results seriously in doubt, we affirm the judgment of the trial court ordering a new special primary.[7]
The following facts and procedural history are relevant to the appeal. An earlier, citywide Democratic primary was held in Bridgeport on September 12, 2017, in which four candidates vied to be the two party nominees from the 133rd district.[8] The two endorsed Democratic party candidates were Michael DeFilippo and the defendant Jeanette Herron, and the two challenging candidates were the plaintiff and Anne Pappas Phillips. At the close of voting on September 12, 2017, the following results were announced and filed with the secretary of the state: DeFilippo, 187 votes; Herron, 170 votes; the plaintiff, 170 votes; and Phillips, 137 votes. Following a recanvass conducted on September 19, 2017, the tie vote between Herron and the plaintiff was broken by **401 one additional vote counted in favor of Herron. On September 26, 2017, the plaintiff commenced this action pursuant to § 9-329a, claiming various improprieties in connection with the counting of the tiebreaking vote.
In October, 2017, the trial court conducted a two day hearing on the plaintiff's complaint. At that hearing, counsel for the city defendants represented to the court that, citywide, there were eleven hand counted absentee ballots that had not been tallied on the night of the primary, and that one of those ballots had contained the tiebreaking vote for Herron that was added to her total during the recanvass. The defendant Charles D. Clemons, Jr., the Bridgeport town clerk, was questioned regarding an official absentee ballot affidavit that was notarized and purportedly bore his signature and oath. Clemons testified that, in fact, he had not signed the affidavit, and, thereafter, he invoked his constitutional privilege against self-incrimination. The following day, the parties stipulated that the results of the September 12, 2017 Democratic primary for the 133rd district would be vacated and that a new special primary including all four Democratic candidates would be conducted on November 14, 2017. In light of the irregularities that had surfaced in connection with the September 12, 2017 Democratic primary, the court appointed a moderator, Attorney Maximino Medina, to act as a neutral monitor in connection with the November 14, 2017 special primary. In addition, the court retained jurisdiction to resolve any disputes that might arise during the special primary.
Prior to the November 14, 2017 special primary, one such issue arose. Specifically, on November 13, 2017, Medina became aware that a Bridgeport police officer, Paul Nicola, was retrieving absentee ballots from voters and delivering them to the town clerk's office at the behest of Mario Testa, the chairman of Bridgeport's Democratic Town Committee. Upon learning of this **402 information, the trial court ordered that, if any further ballots were delivered *1256 to the town clerk by a police officer, Medina must confirm that the delivery was initiated by the voter through either the Bridgeport Police Department or the town clerk's office. Otherwise, the court's order provided, it would hold an evidentiary hearing to address the legitimacy of any absentee ballots lacking Medina's confirmation. The court reserved decision as to whether to conduct such a hearing as to the absentee ballots that already had been delivered by Nicola at Testa's direction on November 13, 2017.
The special primary was held on November 14, 2017, as ordered. The results of that election were: DeFilippo, 240 votes; Herron, 230 votes; the plaintiff, 212 votes; and Phillips, 168 votes. Following the ballot count, the plaintiff again challenged the special primary results pursuant to § 9-329a, claiming multiple improprieties in the absentee balloting process. Specifically, the plaintiff claimed that (1) Nicola's delivery of fourteen absentee ballots to the town clerk at Testa's direction did not comply with § 9-140b, and, as a consequence, those ballots were invalid and should not have been counted, (2) twelve other absentee ballots, which had arrived at town hall lacking postmarks, were not "mailed" within the meaning of § 9-140b (c) and, therefore, were invalid and should not have been counted, and (3) normal and customary supervised absentee balloting procedures were not followed at the Northbridge Health Care Center (Northbridge), a nursing home, thereby disenfranchising that facility's residents from voting in the special primary. The plaintiff further claimed that, as a result of the foregoing improprieties, the results of the special primary were placed seriously in doubt, thus requiring that a new special primary be held.
The trial court conducted an expedited evidentiary hearing on the plaintiff's claims on November 27, 28 and 29, 2017, and, on November 30, 2017, the court **403 issued an oral decision in which it agreed with each of those claims. Although a civil standard of proof applied to the proceedings; see, e.g., Simmons-Cook v. Bridgeport , 285 Conn. 657, 668, 941 A.2d 291 (2008) ; the court was persuaded "even beyond a reasonable doubt that there were substantial violations of the law ... and that, as a result of those violations, the reliability of the result of the special [primary] is seriously in doubt." In the court's view, "[t]he plaintiff ... far exceeded [his] heavy burden of proof" in establishing the claimed violations. The court thereafter ordered that a new special primary be conducted to nominate the Democratic candidates for the city council seats in the 133rd district.[9]
The defendants claim that the trial court improperly resolved each of the plaintiff's claims of absentee balloting impropriety. The defendants also claim generally that the trial court improperly allocated the burden of proof applicable to the proceedings, effectively placing on them the responsibility of disproving the plaintiff's allegations.
Before turning to the defendants' claims, we briefly summarize the general principles applicable to those claims. Section 9-329a authorizes a court to set aside the results of a primary on the basis of, inter alia, an improper ruling of an election *1257 official,[10] and to order **404 that a new primary be held, if the court "finds that but for the error in the ruling of the election official ... the result of [the] primary might have been different and [the court] is unable to determine the result of such primary." General Statutes § 9-329a (b) (3). Pursuant to this standard, "the court must be persuaded that (1) there were substantial violations of the requirements of [an applicable] statute ... and (2) as a result of those violations, the reliability of the result of the election is seriously in doubt.... [A]lthough the underlying facts ... are to be established by a preponderance of the evidence and are subject on appeal to the clearly erroneous standard ... the ultimate determination of whether, based on those underlying facts, a new election is called for-that is, whether there were substantial violations of the statute that render the reliability of the result of the election seriously in doubt-is a mixed question of fact and law that is subject to plenary review on appeal ...." (Citation omitted; internal quotation marks omitted.) Simmons-Cook v. Bridgeport , supra, 285 Conn. at 668, 941 A.2d 291. Our review of the trial court's interpretation of the statutes governing absentee ballot voting also is plenary, with reference to General Statutes § 1-2z and, if necessary, additional tools of statutory construction.[11] **405 Although § 9-329a allows for the invalidation of election results, we have emphasized that such a measure should not be taken lightly. As "[w]e previously have recognized ... under our democratic form of government, an election is the paradigm of the democratic process designed to ascertain and implement the will *1258 of the people.... [E]lection laws ... generally vest the primary responsibility for ascertaining [the] intent and will [of the voters] on the election officials .... We look, therefore, first and foremost to the election officials to manage the election process so that the will of the people is carried out.... Moreover, [t]he delicacy of judicial intrusion into the electoral process ... strongly suggests caution in undertaking such an intrusion.... Finally, we have recognized that voters have a powerful interest in the stability of [an] election because the ordering of a new and different election would result in their election day [disen]franchisement.... [This] background counsels strongly that a court should be very cautious before exercising its power under the [statutes governing election contests] to vacate the results of an election and to order a new election." (Emphasis in original; internal quotation marks omitted.) Simmons-Cook v. Bridgeport , supra, 285 Conn. at 667, 941 A.2d 291 ; see also Bortner v. Woodbridge , 250 Conn. 241, 254-57, 736 A.2d 104 (1999) ("[The statutory **406 scheme] authorizes the one unelected branch of government, the judiciary, to dismantle the basic building block of the democratic process, an election. Thus, [t]he delicacy of judicial intrusion into the electoral process ... strongly suggests caution in undertaking such an intrusion. As we [previously] have indicated, therefore, [the statutory scheme] provides for remedies only under narrowly defined circumstances ... and for limited types of claims ...." [Citations omitted; internal quotation marks omitted.] ).
Finally, this case concerns various statutes applicable to absentee balloting, which is "a special type of voting procedure established by the legislature for those otherwise qualified voters who for one or more of the [statutorily] authorized reasons are unable to cast their ballots at the regular polling place." Wrinn v. Dunleavy , 186 Conn. 125, 142, 440 A.2d 261 (1982) ; see also General Statutes § 9-135.[12] "The right to vote by absentee ballot is a special privilege granted by the legislature, exercisable only under special and specified conditions to [e]nsure the secrecy of the ballot and the fairness of voting by persons in this class." (Internal quotation marks omitted.)
**407 Hardin v. Montgomery , 495 S.W.3d 686, 696 (Ky. 2016) ; see also 26 Am. Jur. 2d 129, Elections § 333 (2014) ("[t]he procedures required by the absentee voting laws serve the purposes of enfranchising qualified voters, preserving ballot secrecy, preventing fraud, and achieving a reasonably prompt determination of election results"). This court previously has recognized "that there is considerable room for fraud in absentee [ballot] voting and that a failure to comply with the regulatory provisions governing absentee [ballot] voting increases the opportunity for fraud." (Internal quotation marks *1259 omitted.) Wrinn v. Dunleavy , supra, at 142-44, 440 A.2d 261. At the same time, "[i]f there is to be [disen]franchisement, it should be because the legislature has seen fit to require it in the interest of an honest suffrage, and has expressed that requirement in unmistakable language." (Internal quotation marks omitted.) Id., at 144-45, 440 A.2d 261. Guided by the foregoing governing legal principles, we now turn to the issues presented in this case.
I
The defendants claim first that the trial court incorrectly concluded that § 9-140b (a) prohibits a party official or candidate from directing a police officer to retrieve absentee ballots from electors and to deliver them to the town clerk. We disagree.
The trial court made the following factual findings related to this issue. Officer Nicola was on patrol duty during the daytime on November 13, 2017, when he was summoned by another officer and directed to meet with Police Chief Armando J. Perez. Nicola then met face to face with Perez, who gave Nicola a duty order to contact and meet with Testa, the chairman of Bridgeport's Democratic Town Committee, because Testa and the party needed an officer to retrieve absentee ballots. Perez told Nicola that Testa would draw up a list and tell Nicola what needed to be done. Nicola then went **408 to a restaurant run by Testa, where Testa introduced him to DeFilippo, one of the endorsed candidates for the Democratic party. Approximately one-half hour later, DeFilippo provided Nicola with a list of absentee ballots to retrieve.
Over the course of that day, Nicola traveled throughout Bridgeport to retrieve absentee ballots, with DeFilippo texting him names and addresses along the way. Nicola continued to pick up ballots on November 14, 2017, despite the court's November 13, 2017 order aimed at discouraging that practice. Nicola retrieved absentee ballots without seeking identification from any of the individuals who delivered them to him and, at times, accepted multiple ballots from a single person.[13] Nicola picked up nine absentee ballots on November 13, 2017, and five absentee ballots on November 14, 2017, for a total of fourteen ballots. After Nicola retrieved the absentee ballots, he delivered them in batches to the town clerk's office, where he signed, dated and timed each ballot in the presence of the town clerk.
The trial court analyzed the language of § 9-140b, governing the return of absentee ballots, and the applicable legislative history, concluding that Nicola's retrieval of ballots at Testa's behest did not comport with the requirements of that statutory provision. The court explained that "[t]he statute allows an absentee voter to contact the registrar of voters ... or the police department for police officer pickup of an absentee ballot due to [a] voter's illness or disability. That process allows for the voter who claims an illness or **409 disability to identify [himself or herself] and voluntarily initiate a request for a ballot pickup." According to the court, the integrity of an absentee ballot submitted in that manner was "entirely lacking" in the present case because Nicola did not know the identities of the people from whom he took ballots, he had, in some cases, taken *1260 multiple ballots from a single person, and, in one case, he simply retrieved a ballot from a mailbox. The court also concluded that § 9-140b"does not allow a candidate to inject [himself or herself] into this aspect of [the] voting process" and that, in the present case, "illegal, partisan party interference [had come] into play." The court determined that, if voters had contacted Testa or DeFilippo for ballot delivery assistance,[14] they should have been advised to contact either the Democratic registrar of voters or the police department directly to have their ballots retrieved.
The defendants argue that the trial court incorrectly concluded that § 9-140b precluded Testa and DeFilippo from dispatching Nicola to retrieve absentee ballots from voters. They claim that nothing in the statute bars a third party, including a party official or a candidate, from asking a police officer to contact an absentee voter and to act as that voter's designee for purposes of returning the voter's absentee ballot. In the defendants' view, the plain language of § 9-140b authorizes anyone to request a ballot pickup on an absentee voter's behalf because there is no explicit restriction in that regard.[15]
**410 The plaintiff, for his part, claims that the trial court correctly interpreted § 9-140b as requiring an absentee voter, himself or herself, to request that a police officer act as a designee for purposes of returning that voter's absentee ballot and as prohibiting partisan individuals from doing so on a voter's behalf. We agree with the plaintiff.
The return of absentee ballots, by various authorized methods, is governed by § 9-140b,[16] which provides in relevant part that "(a) [a]n absentee ballot shall be cast at a primary, election or referendum only if ... (3) it is returned by a designee of an ill or physically disabled ballot applicant, in person, to [the town] clerk not later than the close of the polls on the day of the election, primary or referendum ...." The term "designee" is statutorily defined as "(1) a person who is caring for the applicant because of the applicant's illness or physical disability, including but not limited to ... a licensed physician or a registered or practical nurse, (2) a member of the applicant's family, who is designated by an absentee ballot applicant and who consents to such designation, or (3) if no such person consents or is available, then a police officer, registrar of voters, deputy registrar of voters or assistant registrar of voters in the municipality in which the *1261 applicant resides." General Statutes § 9-140b (b).
This court previously has held that the requirements of § 9-140b are mandatory. See **411 Wrinn v. Dunleavy , supra, 186 Conn. at 145-46, 440 A.2d 261 (interpreting predecessor statute). Accordingly, the return of ballots in a manner not substantially in compliance with § 9-140b will result in their invalidation, regardless of whether there is any proof of fraud. Id., at 148-49, 440 A.2d 261. "Whether fraud has been committed in the handling of certain absentee ballots is irrelevant to the question of whether there has been substantial compliance with all of the mandatory provisions of the absentee voting law.... Had the legislature chosen to do so, it could have enacted a remedial scheme under which ballots would ... be invalidated [only] upon a showing of fraud or other related irregularity. The legislature has instead enacted a regulatory scheme designed to prevent fraud as far as practicable by mandating the way in which absentee ballots are to be handled. The validity of the ballot, therefore, depends not on whether there has been fraud, but on whether there has been substantial compliance with the mandatory requirements." Id., at 149, 440 A.2d 261 ; see also Dombkowski v. Messier , 164 Conn. 204, 209, 319 A.2d 373 (1972) (failure of town clerk to follow mandatory statutory requirements with respect to submission of absentee ballots warranted voiding of those ballots without finding of fraud or wilful misconduct).
To determine whether § 9-140b permits third parties, in particular, partisan individuals, to direct police officers to act as designees for absentee voters, we begin with the text of that statute and related provisions. Section 9-140b, read as a whole, reflects a clear legislative intent to maintain distance between partisan individuals and the casting and submission of absentee ballots, undoubtedly in recognition of the potential for undue influence, intimidation or fraud in the use of those ballots.[17] That statute expressly provides that, **412 except in certain narrowly defined circumstances, "[n]o (1) candidate or (2) agent of a candidate, political party or committee ... shall knowingly be present when an absentee ballot applicant executes an absentee ballot ...." General Statutes § 9-140b (e) ; see also Gonzalez v. State Elections Enforcement Commission , 145 Conn. App. 458, 471-74, 476, 77 A.3d 790 (candidate violated § 9-140b [e] by accompanying voters while they completed absentee ballots at town clerk's office), cert. denied, 310 Conn. 954, 81 A.3d 1181 (2013). Subsection (d), delineating which persons are authorized to possess absentee ballots, does not include any partisan individuals, and subsection (b) does not include such persons among the list of persons who may act as absentee voters' designees for the purpose of returning ballots. See General Statutes § 9-140b (b) and (d).
With respect to who may choose a "designee" for an absentee voter, the language used in § 9-140b manifests an intent on the part of the legislature that a "designee" be a person whom the absentee voter, himself or herself, selects to return his or her ballot. Specifically, that statutory provision indicates that "a designee of an ill or physically disabled ballot applicant " may return the ballot in person; (emphasis added) General Statutes § 9-140b (a) (3) ; and otherwise that "a designee of a person who *1262 applies for an absentee ballot because of illness or physical disability" may return the ballot by mail. (Emphasis added.) General Statutes § 9-140b (a) (1) (B). The verb "designate" is defined as "[t]o indicate, select, appoint, nominate, or set apart for a purpose or duty ...." Black's Law Dictionary (6th Ed. 1990) p. 447. By combining the term "designee" with the phrase "of an ill or physically disabled ballot applicant," or "of [an ill or physically disabled] person," § 9-140b (a) strongly suggests that it is the ballot applicant, and not some third party, who is to select, appoint or nominate an individual, from within the defined universe of qualified **413 persons, to deliver his or her ballot to the town clerk.
Subsection (b) of § 9-140b, which defines "designee," is somewhat more ambiguous in this regard. Although three classes of designees are described, it is only the second class, namely, family members of an absentee ballot applicant, that the statute expressly qualifies with the phrase "designated by an absentee ballot applicant ...." General Statutes § 9-140b (b) (2). Looking to the relevant statutory genealogy, however, an earlier version of the provision made clear that, regardless of the category of designee, the absentee voter was to make any such designation. Specifically, General Statutes (Rev. to 1989) § 9-140b (b) provided that, "[i]n the case of a person who applied for an absentee ballot because of illness or physical disability, the ballot shall only be mailed by the applicant or by any eligible and consenting person designated by the applicant .... An applicant may designate for such purposes only one of the following persons: A licensed physician, registered or practical nurse or any other person who is caring for the applicant because of the applicant's illness or physical disability, a member of the applicant's family or, if no such person consents or is available, then a police officer, registrar of voters or deputy registrar of voters in the municipality in which the applicant resides." (Emphasis added.)
When subsection (b) was amended in 1989; see Public Acts 1989, No. 89-297, § 4; the bill that included those changes-the language of which is substantially similar to the current version of § 9-140b (b) -was described by legislators variously as "an omnibus bill for the [s]ecretary of [the] [s]tate's office ... mak[ing] a number of technical changes in the election law"; 32 S. Proc., Pt. 5, 1989 Sess., p. 1737, remarks of Senator John Atkin; and a "primarily [noncontroversial] cleanup ... of certain of the state's election statutes." 32 H.R. Proc., **414 Pt. 12, 1989 Sess., p. 4062, remarks of Representative Miles Rapoport. The remaining history accompanying the 1989 legislation contains no indication that lawmakers amended subsection (b) with the intent to change its meaning at all, let alone to permit third-party, partisan individuals to assist absentee voters who seek to cast their ballots by selecting designees to return those ballots. In short, the genealogy of § 9-140b (b) also supports the trial court's conclusion that it is only absentee voters who may select designees, from within the described classes of persons, to return their ballots for them.[18]
To the extent that any ambiguity remains, we agree with the trial court that *1263 the legislative history accompanying Public Acts 1974, No. 74-312, § 1-which added to General Statutes (Rev. to 1972) § 9-146, as amended by Public Acts 1972, No. 196, § 14, and Public Acts 1973, No. 73-472, § 1, the predecessor to § 9-140b, the language describing permissible designees for absentee ballot returns-makes it abundantly clear that the legislature intended for partisan individuals like Testa and DeFilippo to be excluded from the process. In introducing the legislation in the House of Representatives, its sponsor, Representative M. James Canali, stated that it would remedy "a very important inequity in our absentee ballot process that exists under the current laws. It will, as much as possible, restrict the partisan party worker from any involvement with the voter after he or she has received his or her ballot, [t]hereby preventing the harassment that currently occurs in many cases today." 17 H.R. Proc., Pt. 10, 1974 Sess., p. 4616. **415 Representative Canali explained further: "[W]e have arrived at a point in time where we must remove the partisan party worker from any involvement in the absentee ballot once an application has been received by the [t]own [c]lerk and the elector has received his or her ballot. The common practice of pursuing the voter and sometimes harassing him to allow the ballot to be picked up [by] party workers has reached the point in many areas of our [s]tate where the inherent privacy [to which] the voter is entitled ... is being seriously violated. We would be seriously outraged if a party worker brought a voter to a polling place, into the place itself and then sits in the voting booth with him or her and exert[s] pressure for [him or her] to vote one way or another. Moreover, we have stringent laws that prevent this activity.... I submit ... that once an absentee voter receives his ... absentee ballot, [he is], in fact, in the polling place, and [he is] entitled to the same rights of privacy of action [applicable] ... should [he] decide to vote in person ... those rights being to ultimately decide who[m] to vote for, or not [to] vote for, or not [to] vote at all, as is [his] conscience, without anyone exerting any pressure on [him].... [W]e must, once and for all, end the absentee ballot contest that pervades our political process." Id., at p. 4617.
In addressing the mechanics of the proposed legislation with respect to the return of an absentee ballot by an ill or disabled elector, Representative Canali explained that such a ballot could be returned by "an elector himself, or by any person designated by that elector ... [such as] a physician, a registered or practical nurse, or any other person who is caring for ... [the] elector because of ... [the] elector's illness or physical disability, a member of such elector's family, or if no such person exists or is available, then a police officer, a [r]egistrar of [v]oters, or a [d]eputy [r]egistrar **416 of [v]oters, in the municipality in which such an elector resides. That gives it the broadest context of allowing that disabled elector to get [his] ballot mailed without having a party worker involve [himself ]." (Emphasis added.) Id., at pp. 4618-19. Finally, in concluding his remarks, Representative Canali stated that the proposed legislation would "once and for all, as much as possible ... remove the partisan party worker from all political parties from pursuing those people who have requested absentee ballots for whatever reason and harassing them to either vote the ballot or to turn the ballot over to the party workers." Id., at p. 4634.
We glean two clear intentions from the foregoing legislative history. First, it is an absentee voter himself or herself, and not a third party, who must appoint or select a designee, from within the approved categories of persons, to return his or her absentee ballot on the *1264 voter's behalf. Second, similar to the mandatory procedures pertaining to in person voters, partisan individuals are required to distance themselves from absentee voters when those voters are in the process of casting their ballots, that is, when they are returning them to the town clerk for submission pursuant to § 9-140b.
In sum, the language and genealogy of § 9-140b support the trial court's conclusion that Nicola's retrieval and return of absentee ballots at the behest of Testa and DeFilippo did not comply with the requirements of § 9-140b. Consequently, the trial court properly invalidated the fourteen ballots that had been returned in that fashion.
II
The defendants next contend that the trial court incorrectly concluded that twelve absentee ballots that arrived at city hall on the day of the Democratic special primary without postmarks were not "mailed" within **417 the meaning of that term, as used in § 9-140b (c). We also reject this claim.
The following additional facts, as found by the trial court, are relevant to our resolution of this issue. On the day of the special primary, Medina, while fulfilling his duties as moderator, spent some time in the mailroom at Bridgeport's city hall. While there, he witnessed Jack McDowell, the mailroom's supervisor, holding a stack of fifteen absentee ballots. Of those ballots, three bore postmarks, whereas the other twelve, although bearing stamps, were not postmarked.[19]
McDowell told Medina that he had brought the absentee ballots directly from the post office to city hall. This was shown, however, to be untrue. Instead, McDowell, while accompanied by another city employee, Emily Zahorsky, had picked up the city's mail from the post office, and then, before returning to city hall, made three more stops at the city's fire department, emergency operations center and health department to deliver and retrieve mail. The two retrieved loose, outgoing mail from both the fire department and the emergency operations center, and commingled that mail in the same mail bin that contained the mail previously retrieved from the post office. Additionally, during each of the three stops, the mail bin was left unattended in the unlocked car that McDowell and Zahorsky had used for the mail pickups.
The trial court found that the evidence established a lack of security with respect to the absentee ballots, which, according to the court, provided a "clear opportunity for absentee ballots that were not sent by the United States Postal Service to be added to the mail **418 either by mistake or by foul play." The court observed that Zahorsky, the city's only witness with respect to the mail pickup,[20] had not seen the absentee ballots until she and McDowell arrived back at the mailroom. In light of the foregoing, the court found that the twelve absentee ballots that were stamped but not postmarked "were not sent by the United States Postal Service" and, therefore, were not "mailed," as contemplated by § 9-140b (c). In accordance with this *1265 finding, the court concluded that those ballots were invalid and should have been rejected by election officials.
The return of absentee ballots by mail is governed by § 9-140b, and those mailing provisions, which we discuss more fully hereinafter, are mandatory. See Wrinn v. Dunleavy , supra, 186 Conn. at 145-46, 440 A.2d 261. Thus, the return of ballots in a manner not substantially in compliance with the statutory mailing requirements will result in their invalidation, regardless of whether there is any proof or indication of fraud. Id., at 148-49, 440 A.2d 261.
Subsection (a) of § 9-140b provides in relevant part that "[a]n absentee ballot shall be cast at a primary, election or referendum only if: (1) It is mailed by (A) the ballot applicant ... so that it is received by the clerk of the municipality in which the applicant is qualified to vote not later than the close of polls ...." (Emphasis added.) The term "mailed" is further defined as "sent by the United States Postal Service or any commercial carrier, courier or messenger service recognized and approved by the Secretary of the State." General Statutes § 9-140b (c). Reading these two provisions together, for absentee votes to be validly cast, the absentee ballot applicants must send their ballots by the United States Postal Service or another recognized carrier so that they are received by the municipal clerk before the close of the polls.
**419 After considering all of the surrounding circumstances, the trial court found, as a factual matter, that the twelve absentee ballots at issue had not been "sent by the United States Postal Service" and, therefore, that they had not been returned in substantial compliance with § 9-140b.[21] We review the trial court's finding for clear error only. See, e.g., Simmons-Cook v. Bridgeport , supra, 285 Conn. at 668, 941 A.2d 291. "A finding of fact is clearly erroneous when there is no evidence in the record to support it ... or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed....
"Because factual findings and credibility determinations are squarely within the trial court's purview, we afford them great deference.... In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached.... Instead, we make every reasonable presumption ... in favor of the court's ruling.... Finally, a finding is not clearly erroneous merely because it relies on circumstantial evidence. See Rawls v. Progressive Northern Ins. Co. , 310 Conn. 768, 777, 83 A.3d 576 (2014) ( [t]here is no distinction between direct and circumstantial evidence so far as probative force is concerned ...). [T]riers of fact must often rely on circumstantial evidence and draw inferences from it.... Proof of a material fact by inference need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact....
**420 In short, the court, as fact finder, may draw whatever inferences from the evidence or facts established by the evidence it deems to be *1266 reasonable and logical." (Citations omitted; internal quotation marks omitted.) Lyme Land Conservation Trust, Inc. v. Platner , 325 Conn. 737, 755-56, 159 A.3d 666 (2017).
We conclude that the trial court's factual finding-namely, that the twelve absentee ballots at issue were not "sent by the United States Postal Service"-is supported by the circumstantial evidence and the inferences reasonably drawn therefrom. First, those ballots were not postmarked, although other absentee ballots that arrived at city hall at the same time were postmarked. A postmark is strong evidence that a piece of mail was processed for delivery at a United States post office on a specific date. See, e.g., In re Coviello v. Knapp , 91 App. Div. 3d 868, 869, 937 N.Y.S.2d 305 (2012) (in state requiring absentee ballots to be cast no later than day before election, ballot lacking ascertainable postmark date and received six days after election could not be cast). The trial court properly could have reasoned that the lack of postmarks on not one but twelve absentee ballots was anomalous and strongly suggestive of irregularity.
Second, McDowell falsely reported to Medina that he had brought the absentee ballots at issue directly from the post office to city hall. To the contrary, sworn testimony at the hearing in the trial court showed that McDowell and Zahorsky made three stops on the way to city hall and, during each of those stops, left the city's mail unattended in their vehicle, creating repeated opportunities for tampering. Moreover, mail retrieved during those stops was commingled with the mail from the post office. These circumstances, coupled with McDowell's falsehood to Medina, increased the likelihood that the absentee ballots lacking postmarks had originated from somewhere other than the post office.
**421 Additionally, as a preface to its rulings on the specific issues before it, the trial court outlined the unusual circumstances that had led to the need for a special primary to be held. More particularly, in the earlier Democratic primary, a tie vote between Herron and the plaintiff was broken after a recanvass when a single additional absentee ballot cast for Herron, a party endorsed candidate, happened to emerge. When called to testify in relation to that ballot, Clemons, the Bridgeport town clerk, invoked his constitutional right against self-incrimination, and the parties' stipulated agreement to hold a new primary followed soon thereafter. Furthermore, the day before the special primary, the court was informed that Testa, a partisan individual, improperly was directing Nicola to retrieve absentee ballots from voters at their homes and to deliver them to city hall. In light of this apparent impropriety, the court issued an order intended to stop that practice.
In view of the foregoing considerations, the trial court's finding that the twelve absentee ballots lacking postmarks, which Zahorsky had not seen until she and McDowell had completed their circuitous journey back to city hall with the day's mail, were not "sent by the United States Postal Service" was a reasonable and logical one, predicated on the facts established and fair inferences drawn from those facts. On the basis of all the facts and circumstances, we disagree with the defendants' contention that the court's finding that the ballots were not "mailed," as contemplated by § 9-140b (c), was merely speculative or conjectural. Consequently, we cannot say that the finding that the ballots were not "mailed" in accordance with the statutory requirement was clearly erroneous, and, as a result, the defendants' second claim fails.
III
The defendants also maintain that the trial court incorrectly concluded that the *1267 supervised absentee balloting **422 conducted at Northbridge did not comply with the minimum requirements of law. We agree with the defendants.
The following additional facts, which were found by the trial court or are not disputed, are necessary to our determination of this issue. Supervised absentee balloting was mandated by statute at Northbridge, a nursing home that had at least eighty residents. See General Statutes §§ 9-159q and 9-159r. Such balloting was scheduled to take place on November 8, 2017, for the November 14, 2017 Democratic special primary.
In the days preceding the earlier Democratic primary held on September 12, 2017, Jennifer Rodriguez, director of therapeutic recreation at Northbridge, and representatives of the Democratic registrar of voters, had gone door to door at the facility to determine which residents wanted to vote in that primary. They distributed absentee ballot applications to those who did and later returned with their absentee ballots. Several residents then voted in the September 12, 2017 primary.
The plaintiff campaigned at Northbridge prior to the September 12, 2017 primary and again before the November 14, 2017 special primary. Prior to the latter event, he went door to door on all four floors of the facility, speaking to residents, and a number of those residents indicated that they intended to vote. In contrast to the assistance that they had rendered to Northbridge residents in advance of the earlier primary, however, neither Rodriguez nor the registrar's representatives visited residents individually in the days prior to the scheduled supervised balloting session on November 8, 2017, to determine whether they sought to vote and, if so, to distribute absentee ballot applications to those voters.
At 9:30 a.m. on November 8, 2017, Medina arrived at Northbridge as part of his moderator duties. He spoke **423 with the individual working at the front reception desk, who had no knowledge of the scheduled supervised balloting. Printed signs announcing the balloting were posted, however, in each of two elevators used by the residents.[22]
The scheduled supervised balloting session occurred between 10 a.m. and 12 p.m. in a second floor reading room, where the Democratic registrar's two representatives awaited residents who wished to cast absentee ballots. Although the representatives had brought absentee ballot applications with them that day, they made no efforts to distribute them to residents. Medina remained at Northbridge throughout the voting period. Residents were seen in the area but did not vote. Ultimately, no Northbridge residents voted at the supervised absentee balloting session on November 8, 2017.
The trial court found that the procedure employed in anticipation of and at the November 8, 2017 supervised absentee balloting session was "in sharp contrast" to the procedure that had been employed prior to the September 12, 2017 primary. After observing, without elaboration, that §§ 9-159q and 9-159r"put affirmative obligations on the [town] clerk and [the] registrar [of voters] with respect to *1268 the preparation and delivery of absentee ballot applications and absentee ballots," the trial court concluded "that the proper procedure was not followed here." In particular, the court explained, "the [Democratic] registrar [of voters] and [her] designees failed to take reasonable steps to deliver the applications **424 and ballots, and failed to post reasonable notice of the supervised absentee balloting so as to inform the potential voters at Northbridge such that Northbridge residents were unaware that the supervised absentee balloting was taking place." The court also stated that the November 8, 2017 session was "[s]tealth supervised balloting [rather than] supervised balloting," and that it was "fundamentally unfair to the Northbridge residents and the candidates ... who, along with the residents of Bridgeport, [were] entitled to cast their votes in a fair and honest election."
The defendants claim that the trial court incorrectly determined that the supervised absentee balloting held at Northbridge was not compliant with the statutes governing that process. They contend that the applicable law did not require the Democratic registrar of voters or her representatives to notify the Northbridge residents of the scheduled supervised absentee balloting and did not mandate that the officials approach residents to discern their voting intentions and to offer them ballot applications. Rather, the defendants argue, the onus is on a voter to apply for an absentee ballot, and only when an application is submitted is the registrar of voters required to deliver an absentee ballot. They emphasize that, "[i]n this case, because no voter at Northbridge applied for an absentee ballot for this election, there was nothing to be delivered." (Emphasis in original.) Our review of the statutes governing supervised absentee balloting leads us to conclude that the defendants' claim is meritorious.
Sections 9-159q and 9-159r govern supervised absentee balloting at certain institutions where electors may reside, including nursing homes. See General Statutes § 9-159q (a) (1) (defining "institution" for purposes of supervised absentee balloting). At institutions housing fewer than twenty electors, supervised absentee balloting may be conducted at the request of the institution's administrator or a registrar of voters; General Statutes § 9-159q (b) ; at those institutions **425 housing twenty or more electors, such as Northbridge, supervised absentee balloting is mandatory, and must be held on a date mutually agreed on by the institution's administrator and the registrars of voters. See General Statutes § 9-159r (a) and (b).
As to either discretionary or mandatory supervised absentee balloting, the relevant statutory provisions direct registrars or their representatives to deliver absentee ballots directly to applicants at institutions on the day that balloting is to occur. General Statutes § 9-159q (f) and (g) ; see General Statutes § 9-159r (b). Procedures also are specified for the selection of the registrar's representatives, the casting and collection of the absentee ballots, and the delivery of such ballots to the town clerk. See General Statutes § 9-159q (g), (h) and (i) ; see also General Statutes § 9-159r (c) (incorporating foregoing subsections for purposes of mandatory supervised absentee balloting). Notably, however, there are no provisions that require town officials either to notify residents at an institution that supervised absentee balloting is to occur there or to approach those residents and to offer them absentee ballot applications in advance of that balloting.[23]
*1269 Rather, in regard to the absentee ballot application process, § 9-159r (b), governing mandatory supervised absentee balloting, provides only that an "[a]pplication for an absentee ballot for [a] ... patient [at an institution **426 having twenty or more electors] shall be made to the clerk of the town in which such patient is eligible to vote. The application procedure set forth in section 9-140 shall apply ...." General Statutes § 9-140 is the statutory provision that governs absentee ballot applications generally and, like §§ 9-159q and 9-159r, does not require town officials to correspond with electors or to offer them absentee ballot applications. Instead, in regard to town officials, § 9-140 explains with a high level of detail what procedures those officials should undertake, or what requirements they must adhere to, after an application for an absentee ballot, or a request for such an application, is received. See General Statutes § 9-140 (a) through (i).
In light of the foregoing, we agree with the defendants that, under our absentee balloting statutes, the onus was on the residents at Northbridge to request absentee ballot applications if they wanted to cast absentee ballots for the November 14, 2017 Democratic special primary. If they had done so, the registrars or their representatives would have been obligated to deliver those ballots to them on November 8, 2017, to be cast in the supervised absentee balloting session that was scheduled on that date. To the extent that those representatives, prior to the September 12, 2017 Democratic primary, made efforts to ascertain whether residents at Northbridge wanted to submit applications for absentee ballots, we conclude that those efforts, while commendable, were not statutorily required and did not give rise to any obligation to repeat the process in a later primary.[24] Similarly, nothing in our statutes required town officials to provide notice of the scheduled supervised absentee balloting session to the residents of **427 Northbridge.[25] It appears, to the contrary, that such notice typically is provided by the administrator of an institution where supervised balloting is to occur, or by his or her agents, as those individuals are in the best position to communicate with the residents. Although, in the present case, that notice likely was ineffective, leading to confusion among the residents,[26] *1270 that circumstance does not constitute a violation of a statutory duty by a town official sufficient to warrant a new special primary. Consequently, the trial court's conclusion to the contrary cannot stand.[27]
IV
To summarize, the trial court properly found that the fourteen absentee ballots returned by Nicola at the behest of Testa and DeFilippo did not comply with § 9-140b (a) (3) and that the twelve absentee ballots that arrived at city hall without postmarks on November 14, 2017, were not "mailed," as contemplated by **428 § 9-140b c). Accordingly, the trial court correctly concluded that all of those ballots were invalid and that they should not have been included in the vote count for the November 14, 2017 special primary. The trial court's separate conclusion that the supervised absentee balloting at Northbridge did not comply with the statutes governing that process is not supported by the evidence. Because the number of absentee ballots properly invalidated by the trial court is greater than Herron's eighteen vote margin of victory over the plaintiff, however, the court correctly determined that the results of the November 14, 2017 special primary had been placed seriously in doubt, thereby necessitating that a new special primary be conducted.
With respect to the reservation of questions of law in Docket No. SC 20029, the answer to the first and third certified questions is yes, and the answer to the second and fourth certified questions is no;[28] with respect to the appeal in Docket No. SC 20040, the judgment is affirmed and the case is remanded for any further proceedings that the trial court may deem appropriate and that are in accordance with this opinion.
In this opinion the other justices concurred.

General Statutes § 9-329a provides in relevant part: "(a) Any ... candidate aggrieved by a ruling of an election official in connection with any primary ... may bring his complaint to any judge of the Superior Court for appropriate action.... If such complaint is made subsequent to such primary it shall be brought, not later than fourteen days after such primary ....
"(b) Such judge shall forthwith order a hearing to be held upon such complaint upon a day not more than five nor less than three days after the making of such order .... Such judge shall, on the day fixed for such hearing, and without delay, proceed to hear the parties and determine the result.... Such judge shall thereupon, if he finds any error in the ruling of the election official ... certify the result of his finding or decision to the Secretary of the State before the tenth day following the conclusion of the hearing. Such judge may ... determine the result of such primary ... [or] ... order a new primary if he finds that but for the error in the ruling of the election official ... the result of such primary might have been different and he is unable to determine the result of such primary.
"(c) The certification by the judge of his finding or decision shall be final and conclusive upon all questions relating to errors in the ruling of such election official ... and shall operate to correct any returns or certificates filed by the election officials, unless the same is appealed from as provided in section 9-325...."

The defendants are Jeanette Herron, a winning candidate in the special primary at issue, as well as Santa I. Ayala, Bridgeport's Democratic registrar of voters, James Mullen, head moderator for the special primary, Thomas Errichetti, head moderator of absentee ballots for the special primary, and Charles D. Clemons, Jr., Bridgeport's town clerk.

The questions reserved by the defendants are:
"1. Does ... General Statutes § 9-140b prohibit any person other than the elector from arranging for a designee to return an elector's absentee ballot to the [t]own [c]lerk?
"2. Did the trial court err in rejecting twelve absentee ballots that were stamped but not postmarked on the ground that they were not 'mailed' pursuant to ... § 9-140b ?
"3. Did the trial court err in deciding that the administration of the supervised absentee balloting at the Northbridge Health Care Center did not meet the minimum standards required by law?
"4. Did the trial court err in applying the burden of proof, and in rejecting votes validly cast by electors, thereby undermining the trial court's conclusion that there were substantial statutory violations that left the reliability of the election seriously in doubt?"
In this opinion, we have reformulated the reserved questions to reflect more accurately the precise issues before us. Cf., e.g., State v. Ouellette , 295 Conn. 173, 184, 989 A.2d 1048 (2010).

General Statutes § 9-325 provides in relevant part: "If, upon [a] ... hearing by a judge of the Superior Court [pursuant to § 9-329 (b) ], any question of law is raised which any party to the complaint claims should be reviewed by the Supreme Court, such judge ... shall transmit [the certificate of his finding or decision], including therein such questions of law, together with a proper finding of facts, to the Chief Justice of the Supreme Court, who shall thereupon call a special session of said court for the purpose of an immediate hearing upon the questions of law so certified.... Nothing in this section shall be considered as prohibiting an appeal to the Supreme Court from a final judgment of the Superior Court...."

We transferred that appeal from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1, and consolidated it with the reservation of questions that the trial court certified and transmitted to this court pursuant to § 9-325. Accordingly, this decision disposes of both the appeal and the reservation of questions.
Section 9-325 explicitly provides that a party is not precluded from filing a simultaneous appeal, provided the appeal is from a final judgment. See footnote 4 of this opinion; see also Wrinn v. Dunleavy , 186 Conn. 125, 133-35, 440 A.2d 261 (1982) (explaining that expedited review proceeding permitted by § 9-325 is in essence appeal but is limited to certain questions of law, and that, if judgment is final, aggrieved party may proceed under § 9-235 and file appeal, normally resulting in consolidation of two proceedings or mooting of one upon disposition of other).

General Statutes § 9-140b provides: "(a) An absentee ballot shall be cast at a primary, election or referendum only if: (1) It is mailed by (A) the ballot applicant, (B) a designee of a person who applies for an absentee ballot because of illness or physical disability, or (C) a member of the immediate family of an applicant who is a student, so that it is received by the clerk of the municipality in which the applicant is qualified to vote not later than the close of the polls; (2) it is returned by the applicant in person to the clerk by the day before a regular election, special election or primary or prior to the opening of the polls on the day of a referendum; (3) it is returned by a designee of an ill or physically disabled ballot applicant, in person, to said clerk not later than the close of the polls on the day of the election, primary or referendum; (4) it is returned by a member of the immediate family of the absentee voter, in person, to said clerk not later than the close of the polls on the day of the election, primary or referendum; (5) in the case of a presidential or overseas ballot, it is mailed or otherwise returned pursuant to the provisions of section 9-158g; or (6) it is returned with the proper identification as required by the Help America Vote Act, P.L. 107-252, as amended from time to time, if applicable, inserted in the outer envelope so such identification can be viewed without opening the inner envelope. A person returning an absentee ballot to the municipal clerk pursuant to subdivision (3) or (4) of this subsection shall present identification and, on the outer envelope of the absentee ballot, sign his name in the presence of the municipal clerk, and indicate his address, his relationship to the voter or his position, and the date and time of such return. As used in this section, 'immediate family' means a dependent relative who resides in the individual's household or any spouse, child or parent of the individual.
"(b) As used in this section and section 9-150c, 'designee' means (1) a person who is caring for the applicant because of the applicant's illness or physical disability, including but not limited to, a licensed physician or a registered or practical nurse, (2) a member of the applicant's family, who is designated by an absentee ballot applicant and who consents to such designation, or (3) if no such person consents or is available, then a police officer, registrar of voters, deputy registrar of voters or assistant registrar of voters in the municipality in which the applicant resides.
"(c) For purposes of this section 'mailed' means sent by the United States Postal Service or any commercial carrier, courier or messenger service recognized and approved by the Secretary of the State.
"(d) No person shall have in his possession any official absentee ballot or ballot envelope for use at any primary, election or referendum except the applicant to whom it was issued, the Secretary of the State or his or her authorized agents, any official printer of absentee ballot forms and his designated carriers, the United States Postal Service, any other carrier, courier or messenger service recognized and approved by the Secretary of the State, any person authorized by a municipal clerk to receive and process official absentee ballot forms on behalf of the municipal clerk, any authorized primary, election or referendum official or any other person authorized by any provision of the general statutes to possess a ballot or ballot envelope.
"(e) No (1) candidate or (2) agent of a candidate, political party or committee, as defined in section 9-601, shall knowingly be present when an absentee ballot applicant executes an absentee ballot, except (A) when the candidate or agent is (i) a member of the immediate family of the applicant or (ii) authorized by law to be present or (B) when the absentee ballot is executed in the office of the municipal clerk and the municipal clerk or an employee of the municipal clerk is a candidate or agent."

On January 25, 2018, we issued an order answering the four certified questions, upholding the trial court's decision to order a new special election, and remanding the case for any further proceedings that the trial court may deem appropriate. We further indicated that a full written opinion of this court, that is, this opinion, would follow in due course.

In Bridgeport, two city council members are elected from each of ten districts within the city. The districts are numbered from 130 to 139. For each district, a political party may nominate or endorse a maximum of two candidates.

The trial court also directed the court clerk to provide a copy of the court's decision to the Office of the Chief State's Attorney, the secretary of the state, and the State Elections Enforcement Commission, and, additionally, to unspecified federal authorities. The court explained that "[t]he fact that [the statutory violations at issue] all occurred in a court-ordered special [primary] election with a court-appointed moderator speaks to the level of dishonesty and corruption when it comes to absentee ballots in ... Bridgeport."

We previously have explained that "a ruling of an election official must involve some act or conduct by the official that ... interprets some statute, regulation or other authoritative legal requirement, applicable to the election process." Bortner v. Woodbridge , 250 Conn. 241, 268, 736 A.2d 104 (1999). This test "is broad enough to include conduct that comes within the scope of a mandatory statute governing the election process, even if the election official has not issued a ruling in any formal sense. When an election statute mandates certain procedures, and the election official has failed to apply or to follow those procedures, such conduct implicitly constitutes an incorrect interpretation of the requirements of the statute and, therefore, is a ruling." Caruso v. Bridgeport , 285 Conn. 618, 647, 941 A.2d 266 (2008) ; see also Wrinn v. Dunleavy , 186 Conn. 125, 138-39, 440 A.2d 261 (1982) (election officials' counting of absentee ballots, which was deemed void on appeal due to noncompliance with predecessor statute to § 9-140b, constituted ruling of election official subject to judicial review). The parties do not dispute that the issues presented in this case constitute rulings of election officials.

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature.... In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply.... In seeking to determine that meaning ... § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.... When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Footnote omitted; internal quotation marks omitted.) Caruso v. Bridgeport , 285 Conn. 618, 638-39, 941 A.2d 266 (2008). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) Price v. Independent Party of CT-State Central , 323 Conn. 529, 539-40, 147 A.3d 1032 (2016).

General Statutes § 9-135 provides: "(a) Any elector eligible to vote at a primary or an election and any person eligible to vote at a referendum may vote by absentee ballot if he or she is unable to appear at his or her polling place during the hours of voting for any of the following reasons: (1) His or her active service with the armed forces of the United States; (2) his or her absence from the town of his or her voting residence during all of the hours of voting; (3) his or her illness; (4) his or her physical disability; (5) the tenets of his or her religion forbid secular activity on the day of the primary, election or referendum; or (6) the required performance of his or her duties as a primary, election or referendum official, including as a town clerk or registrar of voters or as staff of the clerk or registrar, at a polling place other than his or her own during all of the hours of voting at such primary, election or referendum.
"(b) No person shall misrepresent the eligibility requirements for voting by absentee ballot prescribed in subsection (a) of this section, to any elector or prospective absentee ballot applicant."

The court, although finding Nicola to be a credible witness, questioned the accuracy of his testimony that the majority of voters from whom he had retrieved ballots were elderly, in light of the known birth dates of those voters, which indicated otherwise. For that reason, the court found that many individuals who gave Nicola ballots "were not the actual absentee ballot voters, therefore calling into question violations of ... § 9-140b (d), which delineates who may legally possess completed absentee ballots."

The precise manner in which the ballot pickups were initiated was not established at the evidentiary hearing. Testa and DeFilippo retained counsel, who informed the trial court at the start of the evidentiary hearing that neither of them would appear without a subpoena. At an earlier court proceeding, however, counsel for Testa and DeFilippo apparently had conveyed the impression that both men would appear voluntarily, thereby making a subpoena unnecessary. In any event, neither was served with a subpoena, and neither testified at the hearing.

The defendants also claim that § 9-140b must be construed liberally because, pursuant to General Statutes § 9-359 (5), a violation of § 9-140b carries criminal consequences. In contrast to those cases on which the defendants rely to support this argument, however, the present case is not a criminal one; rather, it is an election dispute to be decided under the rules and principles applicable to such disputes. Notably, in the event of any criminal prosecution, the state, to obtain a conviction, must prove a wilful violation of § 9-140b. General Statutes § 9-359 (5).
The defendants further argue that the secretary of the state and the State Elections Enforcement Commission have interpreted the law to allow partisan contact with absentee voters. This case goes beyond mere contact with voters, however, and involves active participation in the process of the casting of an absentee ballot.

See footnote 6 of this opinion.

Maintaining distance between partisan individuals and the casting and submission of absentee ballots is consistent with the law governing voting at a polling place, which requires partisan individuals to stay outside a radius of at least seventy-five feet from the entrance to such polling place on an election day. See General Statutes § 9-236 (a).

General Statutes § 9-150c, which governs the procedure to be used when a person requests an absentee ballot within six days of an election due to unforeseen illness or physical disability, provides further support for the proposition that an absentee voter must be the one to choose his or her designee. Specifically, § 9-150c borrows the definition of "designee" from § 9-140b (b), and provides that "[a ]n applicant [suffering from an unforeseen illness or physical disability] may appoint [such ] a designee ... to deliver the ballot to him ...." (Emphasis added.)

Medina testified that McDowell had told him that mail lacking postmarks was not unusual. When Medina asked McDowell to provide another example, however, he could not do so. Medina testified further that absentee ballots that arrived after November 14, 2017, were postmarked.

McDowell was in Florida at the time of the evidentiary hearing and, according to counsel for the city defendants, was not reachable by telephone.

The trial court did not conclude, as a matter of law, as the defendants suggest, that a ballot lacking a postmark is necessarily not sent by the United States Postal Service. Although the lack of a postmark is not dispositive of the question of whether the ballot at issue was mailed, it is one factor, among others, to be considered, and the trial court's analysis clearly reflects that multifactor approach.

Rodriguez testified that an announcement pertaining to the absentee balloting session was made on the facility's overhead audio system between 9:30 and 10 a.m. on November 8, 2017, but the trial court, noting that Medina did not mention any announcement, rejected Rodriguez' testimony in this regard. In its decision, the court did not acknowledge Rodriguez' additional testimony that notice also was posted on a large calendar in an area that notified residents of daily events and that she personally had reminded residents of the scheduled voting when she encountered them around the facility.

In contrast, General Statutes § 9-159s requires, in the case of residents at certain institutions who have conservators or guardians to manage their affairs, that a conservator or guardian receive advance notice of "any voter registration or voting opportunity ... presented to the resident with respect to a primary, referendum or election," including absentee balloting. General Statutes § 9-159s (a). Notably, even in these circumstances, the individual charged with giving such notice is the administrator of the institution rather than any town official. General Statutes § 9-159s (a).

The plaintiff contends that the supervised absentee balloting practices utilized at Northbridge in the previous Democratic primary "set the minimum standards required by law." Because he has not provided any authority or analysis in support of this proposition, we reject it.

In contrast, municipal officials are required to provide published notice of municipal elections to the electorate generally. See General Statutes § 9-226 ("The warning of each municipal election shall specify the objects for which such election is to be held. Notice of a town election shall be given by the town clerk or assistant town clerk, by publishing a warning in a newspaper published in such town or having a general circulation therein, such publication to be not more than fifteen, nor less than five days previous to holding the election."). There is no claim in the present case with respect to the adequacy of the foregoing notice.

Notably, supervised balloting for the general election took place at Northbridge on November 7, 2017, the day before the November 8, 2017 supervised balloting session for the new special primary to nominate Democratic candidates to run for the council seats in the 133rd district. Under the circumstances, it is not surprising that voters at Northbridge might have been confused.

Our disposition of the defendants' first three claims necessarily disposes of the fourth. More specifically, because we already have determined that the trial court correctly concluded that the plaintiff had established two sets of violations of § 9-140b, and also have agreed with the defendants that no impropriety was proven in connection with the supervised absentee balloting at Northbridge, the defendants' claim that the court improperly allocated the burden of proof in this case requires no further discussion.

See footnote 3 of this opinion.