******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# PHYLLIS AIREY ET AL. *v.* GISELLE FELICIANO ET AL.
## (SC 20991)

Robinson, C. J., and McDonald, D'Auria, Ecker and Dannehy, Js.

### *Syllabus*

The intervening defendants, a slate of candidates seeking to appear on the ballot for the March 5, 2024 primary election for the Democratic Town Committee for the seventh district of the city of Hartford, appealed from the judgment of the trial court in favor of the plaintiffs, members of a competing slate of candidates, on the plaintiffs' complaint and in part for the intervening defendants on their counterclaim. The intervening defendants claimed that the trial court improperly invalidated a petition sheet that they had used to qualify for the primary on the ground that it bore the signature of N, whose son had signed N's signature on the sheet under a purported power of attorney. They also claimed that, if the trial court was required to reject the petition sheet bearing N's purported signature, it was also required to reject five petition sheets submitted by the plaintiffs because those sheets did not include a written tally of the number of verified signatures, as required by statute (§ 9-410 (c)). *Held*:

The trial court properly rejected N's purported signature because, regardless of whether § 9-410 (a) permits an agent to sign a primary petition, there was no evidence in the record that N's son was acting pursuant to a valid power of attorney under the Connecticut Uniform Power of Attorney Act (§ 1-350 et seq.) or that the specific authority to sign political petitions on N's behalf fell within the scope of the purported power of attorney.

The trial court correctly determined that the entire petition sheet bearing N's purported signature must be rejected, as the applicable statute (§ 9-412) was clear that the entire page on which the purported signature appeared must be rejected for procedural violations of § 9-410, including the submission of an illegal signature accompanied by a false attestation, and those statutes contain no implied exception for violations that result from a misunderstanding of the law rather than fraudulent intent.

The trial court incorrectly determined that the five petition sheets submitted on behalf of the plaintiffs without the signature count required by § 9-410 (c) substantially complied with that statute, and the court should have invalidated those petition sheets.

Argued March 19—officially released August 1, 2024*

---

* August 1, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

*Procedural History*

Action for a judgment declaring that certain signatures on a petition sheet circulated by a slate of candidates seeking to appear on the ballot for a certain primary election for the Democratic Town Committee for the seventh district for the city of Hartford were invalid and that the slate was not qualified for nomination due to a failure to file the necessary number of signatures, and for other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Noble, J.*, granted the motion filed by Kenneth P. Green et al. to intervene as defendants; thereafter, the intervening defendant Kenneth P. Green et al. filed a counterclaim; subsequently, the case was tried to the court, *Noble, J.*; judgment for the plaintiffs on their complaint and in part for the intervening defendants on their counterclaim, and an order directing the named defendant et al. to remove the names of the intervening defendants from the ballot, from which the intervening defendants appealed. *Reversed in part*; *further proceedings.*

*Alexander T. Taubes*, for the appellants (intervening defendants).

*John B. Kennelly*, for the appellees (plaintiffs).

*Opinion*

McDONALD, J. This case highlights how important it is that individuals seeking elected office familiarize themselves with and adhere to the laws that our legislature has enacted to secure the integrity of the electoral process. The appeal arises from efforts by two competing slates of candidates to collect enough petition signatures to qualify to appear on the ballot for the March 5, 2024 primary election for the Democratic Town Committee for the seventh district of the city of Hartford. The named defendant, Giselle Feliciano, the Demo-

cratic registrar of voters for the city of Hartford, and the defendant city clerk, Noel McGregor, initially certified that both slates had obtained more than the 375 valid petition signatures necessary to qualify for the primary. The slate that includes the named plaintiff, Phyllis Airey (Airey slate, or Airey),[1] then initiated the present action, alleging that the slate that includes defendant Kenneth P. Green (Green slate, or Green)[2] should be disqualified because one of the petition sheets used to qualify the Green slate revealed statutory irregularities. Specifically, Airey alleged that one signature on the sheet, that of Clement Nurse, had not in fact been provided by Nurse but, rather, by his son, Andrew Nurse (Andrew), under a purported power of attorney. The individual members of the Green slate then successfully moved to intervene and filed a counterclaim, alleging that (1) one sheet of the Airey petition should be rejected because it contained the forged signature of Lawrence Williams, and (2) five other sheets of the Airey petition should be disqualified because they failed to include a written tally of the number of verified signatures, as required by General Statutes § 9-410 (c).

The trial court agreed that the sheets containing the Nurse and Williams signatures must be rejected but determined that the other five challenged Airey sheets substantially complied with § 9-410 (c). This decision left only the Airey slate with the necessary 375 valid signatures. On appeal, Green contends that the sheet purporting to contain Nurse's signature should not have been rejected and, in the alternative, that all of the

---

[1] The other plaintiff members of the Airey slate are Ayesha Clarke, Amir Rasheed Johnson, Dyshawn Thames, Ewan Shariff, Michelle Whatley, Donna Thompson-Daniel, Andrew Rodney, Yvette Mosely, Raymond Dolphin, Cambar Edwards, Francisca Nugent, Charmaine Anderson, and John Davis.

[2] The other intervening defendant members of the Green slate are Benita Toussaint, Helen Boutte, Elaine Hatcher, Cynthia Jennings, Kreeshawn Rismay, Katibu Hatcher, Keith Bolling, Jr., Elisha Barrows, Camille Thomas, Ashley Thomas, and Sherma Rismay.

challenged Airey sheets must be rejected as well. Affirming in part and reversing in part the judgment of the trial court, we conclude that all of the challenged sheets must be rejected, resulting in the disqualification of both slates.

The following facts, as found by the trial court or otherwise undisputed, are relevant to our disposition. Both slates submitted their petition sheets to Feliciano on January 31, 2024, the statutory deadline. Feliciano, in turn, submitted the sheets to McGregor, who certified that each slate had collected and submitted more than the minimally required 375 petition signatures, which qualified them to appear on the primary ballot. See General Statutes §§ 9-405 and 9-406. Feliciano ultimately certified that the Green slate had submitted 382 qualifying signatures of registered Democratic voters residing in the seventh district, and that the Airey slate had submitted 429 qualifying signatures.

Airey commenced the present action pursuant to General Statutes § 9-329a, and the Green slate members subsequently intervened as defendants and filed a counterclaim. Each party claimed entitlement to a judgment declaring that the opposing slate of potential candidates was ineligible for consideration in the primary due to defects in their respective petitions, and each sought a corresponding order of mandamus. The case was tried to the court.

With respect to Airey's claim, Ashley Thomas, who was responsible for the petition sheet purporting to contain Nurse's signature, testified that she had only recently become engaged in town politics when she agreed to circulate petitions for the Green slate. On her first day seeking signatures, Thomas observed a male leaving Nurse's apartment. The male initially identified himself as Nurse but later volunteered that he was actually Nurse's son, Andrew. Andrew indicated that he possessed a power of attorney and had the authority to sign documents on Nurse's behalf, including the petition.

Thomas believed that Andrew, having the legal authority to sign Nurse's name, could sign the petition on Nurse's behalf. Andrew proceeded to sign Nurse's name, without providing any indication on the petition that the signature was not actually Nurse's. On the back of the sheet, Thomas signed a "statement of authenticity of signatures," as required by § 9-410 (c), attesting that "each person whose name appears on [the] sheet signed the same in person in [her] presence . . . ."

At trial, Nurse provided contradictory testimony and acknowledged feeling confused and having a poor memory. He testified that he signed the petition and that the signature on the petition was his, but he also admitted that he had signed two affidavits averring that the signature was not his and that he had not had any contact with the circulator. Nurse confirmed that Andrew has a power of attorney permitting him to sign documents on his behalf and that Andrew does, in fact, sign documents on his behalf. Andrew did not testify at trial, and there was no testimony as to what powers were afforded to him under the purported power of attorney, and there was no written power of attorney proffered.

The trial court issued a memorandum of decision on March 1, 2024, four days before the primary was to be held. The court found that Nurse did not sign the petition sheet bearing his purported signature but that he had granted Andrew a power of attorney of undetermined scope. The court concluded that the signature was submitted in violation of § 9-410 (a) and (b), which make it illegal to sign a name other than the signee's own to a primary election petition without the legal authority to do so. The court further concluded that Thomas had knowingly and falsely attested that she had verified the signature as Nurse's and, therefore, that the entire sheet of twenty names must be rejected. Because the loss of twenty signatures reduced Green's total to 362 signees, less than the statutory minimum,

the trial court directed Feliciano and McGregor to remove the Green slate from the primary ballot.

With respect to Green's counterclaim, the trial court found that the signature purporting to be that of Lawrence Williams was not, in fact, his and determined that the entire sheet of twenty signatures on which his name appeared must be rejected, reducing Airey's total from 429 to 409 valid signatures. Airey does not challenge those findings and determinations, and they are not before us on appeal.

Green also challenged three sheets of Airey's petition circulated and submitted by Thomas Clarke and two sheets circulated and submitted by Andrew Rodney. The trial court found that those circulators had not included on each sheet the required tally of the total number of authenticated signatures, as required by § 9-410 (c). Nevertheless, the court concluded that the sheets were completed in substantial compliance with § 9-410 (c) because "the number of signatures is readily determined by a quick review of the numbered signature pages." The trial court thus denied Green's request that these five sheets be rejected, which left Airey with 409 valid signatures and allowed the Airey slate to remain on the primary ballot.

The trial court rendered judgment accordingly,[3] and this direct appeal followed.[4] Additional facts will be set forth as necessary.

[3] With only one authorized slate remaining, Feliciano and McGregor canceled the March 5 primary.

[4] After this appeal was filed, this court determined that it would treat the appeal as if it had been filed in the Appellate Court and transferred the appeal to itself. See, e.g., *Caruso* v. *Bridgeport*, 285 Conn. 618, 622 n.3, 941 A.2d 266 (2008) (relying on *Bortner* v. *Woodbridge*, 250 Conn. 241, 245 n.4, 736 A.2d 104 (1999)). But see *In re Election of the United States Representative for the Second Congressional District*, 231 Conn. 602, 608 n.5, 653 A.2d 79 (1994) (suggesting in dictum that, in addition to certified questions, General Statutes § 9-325 authorizes direct appeals to this court in primary election disputes decided under § 9-329a); *Penn* v. *Irizarry*, 220 Conn. 682, 600 A.2d 1024 (1991) (entertaining direct appeal without comment). We invite the legislature to clarify whether the 1978 amendments to § 9-325;

## I

We begin with Green's claim that the trial court should not have disqualified Nurse's purported signature. Green further contends that, even if that one signature was properly disqualified, the trial court should not have invalidated the entire petition page on which that signature appeared. We are not persuaded.

## A

Green's argument that it was permissible for Andrew to sign Nurse's name in his stead relies on § 9-410 (a).[5] That statute provides in relevant part: "The petition form for candidacies for nomination to municipal office or for election as members of town committees shall be prescribed by the Secretary of the State and provided by the registrar of the municipality in which the candidacy is to be filed . . . and signatures shall be obtained only on such forms or such duplicate petition pages. Such form shall include, at the top of the form and in bold print, the following:

WARNING

IT IS A CRIME TO SIGN THIS PETITION

IN THE NAME OF ANOTHER PERSON

WITHOUT LEGAL AUTHORITY TO DO SO

AND YOU MAY NOT SIGN THIS PETITION

IF YOU ARE NOT AN ELECTOR."

General Statutes § 9-410 (a).[6]

Green contends that this language, "without legal authority to do so," implies that there are situations in

---

Public Acts 1978, No. 78-125, § 10; authorize direct appeals to this court outside of the certified question process.

[5] For a more extensive discussion of the governing legal framework, the reader is directed to this court's decision in *Arciniega* v. *Feliciano*, 329 Conn. 293, 296–300, 184 A.3d 1202 (2018).

[6] General Statutes § 9-410 (b) makes it a crime to sign another person's name to a primary petition, without any indication that there is an exception for those who have legal authority to so sign.

which one individual has the legal authority to sign a primary petition for another voter. Green further contends that the Connecticut Uniform Power of Attorney Act (act), General Statutes § 1-350 et seq., provides such legal authority. Green points specifically to General Statutes § 1-351b (7), which provides in relevant part that, by default, a general power of attorney authorizes the agent to "[p]repare, execute and file a record, report or other document to safeguard or promote the principal's interest under a federal or state statute or regulation . . . ." Green argues that this encompasses the signing of electoral petitions.

The trial court rejected this argument on the theory that there is one, and only one, statute that expressly allows an authorized agent to sign a political petition for another person: General Statutes § 9-6b permits an authorized agent to sign a petition on behalf of a blind person. The court construed § 9-6b to mean that, when the legislature wants to authorize proxy signatures for purposes of § 9-410 (a), it does so expressly, as it did in § 9-6b; we should not read other statutes, such as the power of attorney laws, which provide for more general forms of agency, to create, by implication, additional exceptions to the requirements of § 9-410 (a).

We recognize that two important distinctions between § 9-6b and § 1-351b (7), aside from the fact that only the former applies to electoral petitions by its express terms, appear to support the trial court's reasoning. One of those distinctions is that § 9-6b sets forth specific procedures that must be followed before an authorized agent can legally sign a petition on behalf of a blind elector.[7] Those procedures are calculated to ensure not

[7] General Statutes § 9-6b (b) provides in relevant part: "Any person who is blind . . . may cause his name to be affixed to a petition . . . provided an authorized agent reads aloud the full text of the petition in the presence of the circulator, and the blind person consents to having his name appear thereon. In the event a blind person is unable to write, his authorized agent may write the name of such blind person followed by the word 'by' and his own signature. . . . No circulator shall act as an authorized agent."

only that the blind person understands the nature of the petition that he or she is supporting but also that it is clear, both to the circulator and to those reviewing the petition, that the signature is that of an authorized agent for a blind person. See General Statutes § 9-6b (b).

The statutory provisions governing powers of attorney in general contain no such protections. In the present case, for example, Thomas testified that she encountered Andrew in the hallway as he was leaving Nurse's apartment, and it was there that he signed the petition. There is no indication that Nurse was even aware of the interaction, let alone that he understood and approved of the petition that Andrew was signing on his behalf. Further, Andrew signed Nurse's name without memorializing that he was doing so as an authorized agent.[8]

A second distinction is that § 9-6b respects the autonomy of blind persons, while also safeguarding the fundamental democratic principle of one person, one vote. Allowing petitions to be signed by a power of attorney, by contrast, runs the risk of devolving into improper proxy voting. The agent may believe that he is entitled to exercise discretion to sign a petition on the basis of his own opinion, when the principal would choose otherwise. And an agent who held a power of attorney for both of his parents could, in effect, cast three votes.

This is presumably one reason why a Connecticut power of attorney confers neither the authority to exercise by proxy voting rights with respect to an entity;

___

[8] As the trial court noted, in other contexts in which electors may receive assistance or proxy signatures from authorized agents, the legislature also has required that the agent sign and indicate that he or she is submitting a signature on the principal's behalf. See, e.g., General Statutes § 9-23g (b) (authorized agent may sign application for admission as elector on behalf of applicant who is unable to write); General Statutes § 9-140a (absentee ballot applicant who is unable to write may cause name to be signed on ballot form by authorized agent).

General Statutes § 1-350b (3); nor "[any] power created on a form prescribed by a government or governmental subdivision, agency or instrumentality for a governmental purpose." General Statutes § 1-350b (4). That is not to say that the legislature could not constitutionally authorize such voting—a question on which we express no opinion—only that we would expect that, if it wanted to do so, it would do so expressly, as it did in § 9-6b.

Nevertheless, we need not decide whether the trial court correctly construed the act. Regardless of whether the legislature intended to permit (or preclude) an agent to sign a petition pursuant to the act, there is no evidence that Andrew was acting under § 1-351b pursuant to a valid power of attorney. Indeed, there are at least three key gaps in the record.

First, it is not clear that whatever power of attorney Nurse granted to Andrew was executed pursuant to the act. The act took effect relatively recently, on October 1, 2016. See Public Acts 2016, No. 16-40; Public Acts 2015, No. 15-240. Powers of attorney executed in Connecticut pursuant to a previous law, or those executed in another jurisdiction pursuant to the law of that jurisdiction, must comply with the law under which they were executed. See General Statutes §§ 1-350e and 1-350f. There is no indication as to whether the purported power of attorney was executed in Connecticut after October 1, 2016.

Second, even if we assume, for the sake of argument, that Nurse's power of attorney was executed pursuant to the act, to be valid it must be in the form of a writing or other record "inscribed on [another] tangible medium . . . that is . . . retrievable in perceivable form"; General Statutes § 1-350a (7) and (11); and it must be dated and signed in the presence of two witnesses. General Statutes § 1-350d. No such signed and witnessed writing or other tangible record was prof-

fered to verify that Nurse's purported power of attorney was valid and enforceable. Although the trial court credited the testimony that Nurse granted Andrew some form of a power of attorney, there was no evidence by which to determine whether that power of attorney complied with the statutory requirements.

Third, there was no testimony or other evidence as to the scope of the alleged power of attorney. Even if Green were correct that the act *permits* an individual such as Nurse to grant a power of attorney to sign political petitions on his behalf, there is no way to know whether Nurse did, in fact, grant that specific authority to Andrew. For these reasons, we reject Green's claim that the trial court incorrectly concluded that Nurse's purported signature must be rejected pursuant to § 9-410.

B

We also are not persuaded by Green's alternative claim that, even if Nurse's purported signature was properly rejected, the trial court should have ordered that only one signature be rejected, and not the other nineteen signatures on that page. The precise nature of Green's argument is not entirely clear. The trial court held that the entire signature page must be rejected pursuant to General Statutes § 9-412, but Green has not addressed or attempted to construe that provision.

Section 9-412 sets forth one scenario under which the registrar of voters is required to reject only an individual signature on a petition, namely, if the name does not appear on the current enrollment list. The statute also specifies that an individual name should not be rejected if the street address on the petition differs from that on the enrollment list, so long as the signee is eligible to vote for the candidate and the stated date of birth matches that on the person's registration record. General Statutes § 9-412. The statute further provides in

relevant part: "The registrar shall reject any page of a petition which does not contain the certifications provided in section 9-410, or which the registrar determines to have been circulated in violation of any other provision of section 9-410. . . ." General Statutes § 9-412. Section 9-410 (c) independently requires that the registrar reject "[a]ny sheet of a petition . . . upon which the statement of the circulator is incomplete in any respect . . . ."

On its face, the statutory language plainly supports the trial court's determination that the entire sheet containing Nurse's name must be rejected. The statutory scheme distinguishes between violations that call for the rejection only of an individual name and those that call for an entire sheet to be rejected. The disqualification of Nurse's purported signature arose from a violation of § 9-410, namely, that Thomas knowingly and falsely attested that each person whose name appeared on the sheet had signed in her presence. Section 9-412 dictates that the offending page *shall* be rejected for the violation of *any* provision of § 9-410. Thomas' attestation also was incomplete, insofar as she failed to indicate the circumstances surrounding Nurse's purported signature, and § 9-410 (c) dictates that any such sheet "*shall* be rejected . . . ." (Emphasis added.)

Although the word "shall" is not always used in its mandatory sense; see, e.g., *Wilton Campus 1691, LLC* v. *Wilton*, 339 Conn. 157, 168, 260 A.3d 464 (2021); we previously have construed § 9-412 to require the disqualification of any petition page found to be in violation of § 9-410. See, e.g., *Arciniega* v. *Feliciano*, 329 Conn. 293, 297, 184 A.3d 1202 (2018) ("[t]he registrar *must reject* any petition page that fails to contain the requisite certifications by the circulator or that was circulated in violation of the specified procedures" (emphasis added)); see also *Keeley* v. *Ayala*, 328 Conn. 393, 410, 179 A.3d 1249 (2018) (concluding that General

Statutes § 9-140b, governing return of absentee ballots, is mandatory). Green neither invites us to revisit *Arciniega* nor offers a competing interpretation of the statute.

Rather, Green argues that (1) the violation of § 9-410, if there was one, was de minimis, because Thomas acted in good faith, with no intent to commit fraud, and, therefore, Green substantially complied with the statutory requirements, and (2) to reject all twenty signatures, and thereby disqualify Green, would disenfranchise voters, contrary to the purpose of the statutory scheme. Both arguments miss the mark.

With respect to the first argument, we determined previously in this opinion that Green did not substantially comply with § 9-410, as Thomas knowingly allowed Andrew to sign for Nurse, without legal authorization and without providing any indication that the signature was not that of the named voter.[9] The question, then, is whether §§ 9-410 and 9-412 contain an implied exception for "honest mistakes," that is, for violations that result from a misunderstanding of the law and not from any fraudulent intent. There is no indication that they do. Section 9-412 itself is framed broadly, requiring the rejection of a petition page circulated in violation of *any* provision of § 9-410. Section 9-410 itself requires the registrar to reject a full petition page for a number of additional violations, including the certification by the registrars of two or more municipalities; General Statutes § 9-410 (b); the failure to include a statement that the circulator is an enrolled party member in the

---

[9] To the extent that Green argues that an individual such as Thomas may clearly violate and yet substantially comply with a statutory requirement—whether because she acted in good faith or because she complied with all other statutory requirements, or because compliance with the requirement is alleged to be less important than fostering full participation in the democratic process—that argument fails for the reasons discussed in part II of this opinion.

municipality; General Statutes § 9-410 (c); and the circulation of a petition by one candidate for another candidate for the same position. General Statutes § 9-410 (c). Section 9-410 (c) then concludes with a catchall provision that requires the rejection of a petition sheet for a range of other violations: "Any sheet of a petition filed with the registrar which does not contain . . . a statement by the circulator as to the authenticity of the signatures thereon, or upon which the statement of the circulator is incomplete *in any respect*, or which does not contain the certification hereinbefore required by the registrar of the town in which the circulator is an enrolled party member, shall be rejected by the registrar." (Emphasis added.) The fact that § 9-410 requires the rejection of a petition sheet for such a wide array of violations, none of which by its terms must be predicated on fraudulent intent or bad faith on the part of the signee, the circulator, or the registrar, counsels strongly against reading a good faith exception into either statute. See, e.g., *Keeley* v. *Ayala*, supra, 328 Conn. 411 (concluding that failure to substantially comply with § 9-140b results in invalidation, regardless of lack of evidence of fraudulent intent, because, " '[h]ad the legislature chosen to do so, it could have enacted a remedial scheme under which ballots would . . . be invalidated [only] upon a showing of fraud or other related irregularity' "); *Wrinn* v. *Dunleavy*, 186 Conn. 125, 149, 440 A.2d 261 (1982) ("[w]hether fraud has been committed . . . is irrelevant to the question of whether there has been substantial compliance"). Put differently, the fact that the legislature may have enacted a statute with one purpose being to prevent or deter electoral fraud does not mean that evidence of fraudulent intent is necessary to establish a violation of the statute.

With respect to Green's second argument, we recognize that the statutory scheme has, from the outset, reflected a balancing of competing interests. The legis-

lature has encouraged and attempted to facilitate full participation in the democratic process, while at the same time minimizing the possibility of fraud, which tends to erode public faith in our elections. See *State ex rel. Bell* v. *Weed*, 60 Conn. 18, 22, 22 A. 443 (1891). If Green believes that the balance has tipped too far toward one side or the other, that concern is better directed to the elected branches of government than to this court. See, e.g., *Arciniega* v. *Feliciano*, supra, 329 Conn. 310 ("recourse lies with other branches of the government"). As §§ 9-410 and 9-412 are currently drafted, however, it is clear that the legislature intended that entire petition pages would be rejected for a range of procedural violations, including the submission of an illegal signature accompanied by a false attestation. For these reasons, we conclude that the trial court correctly determined that not only Nurse's purported signature but the full petition page containing that signature must be rejected.

II

We next consider Green's claim that, if the statutory scheme requires the rejection of the page containing Nurse's name, then it also requires the rejection of those pages of the Airey petition that were submitted in violation of § 9-410 (c). We agree.

As we discussed, § 9-410 (c) mandates that "[e]ach separate sheet of [a] petition shall contain a statement as to the authenticity of the signatures thereon *and the number of such signatures* . . . . Any sheet of a petition filed with the registrar which does not contain such a statement . . . shall be rejected by the registrar." (Emphasis added.) There is no dispute that five pages of the Airey petition did not contain the required signature count, in violation of the statute, and that the requirement is mandatory. The only question is whether the trial court correctly determined that the rejection of

those pages was not required because Airey had, nevertheless, substantially complied with the statutory requirements. We address that question de novo. See, e.g., *Keeley* v. *Ayala*, supra, 328 Conn. 404.

The principle that a court should not lightly vacate the results of a democratically conducted election when there has been substantial compliance with the relevant statutes and other legal requirements has been established in Connecticut for well over one century. See *State ex rel. Bell* v. *Weed*, supra, 60 Conn. 24. From the start, however, this court also recognized both that "guard[ing] the ballot box against illegal votes and corrupt practices . . . is a duty of the highest importance," to be balanced against "the right of the qualified voter to have his vote counted"; id., 22; and that the substantial compliance doctrine cannot be extended so far as to contravene a clear statutory requirement. See id., 22–24.

More recently, this court has given what at times may appear to be conflicting guidance as to the scope of the substantial compliance doctrine, especially with respect to statutes that impose mandatory duties. In *Butts* v. *Bysiewicz*, 298 Conn. 665, 5 A.3d 932 (2010), for example, we defined the scope of the doctrine quite narrowly, stating: "There are only two election cases in which this court has stated that a mandatory requirement of an election law could be satisfied by substantial compliance. In *Dombkowski* v. *Messier*, 164 Conn. 204, 206–208, 319 A.2d 373 (1972), the court deemed such a result would be proper when, unlike the present case, there was no adverse consequence specifically prescribed for noncompliance with the requirement at issue. In *Wrinn* v. *Dunleavy*, [supra, 186 Conn. 147–50], the court acknowledged the substantial compliance standard, but in effect applied strict compliance by concluding that, because the absentee ballot had not been mailed by any of the enumerated persons authorized

by statute to do so, the ballots could not be counted." *Butts* v. *Bysiewicz*, supra, 689 n.23. In other cases, however, we have indicated that, even with respect to mandatory statutory requirements governing the electoral process, only substantial compliance is necessary. See, e.g., *Cohen* v. *Rossi*, 346 Conn. 642, 661, 295 A.3d 75 (2023); *In re Election of the United States Representative for the Second Congressional District*, 231 Conn. 602, 651, 653 A.2d 79 (1994).

Some—although perhaps not all—of the confusion engendered by these apparently conflicting statements may be dispelled by emphasizing a distinction implicit in our electoral jurisprudence.[10] On the one hand, there are the quintessential substantial compliance cases in which, although there may not have been full, technical compliance with a specific statutory mandate, that particular requirement had, in essence, been satisfied. In those instances, substantial compliance is enough. This would be a different case, for example, if Clarke had written "15+5," when he should have recorded "20" verified signatures on his full sheets, or if Rodney, instead of recording the total on each page, as required by statute, had attached one master sheet listing the verified totals for each of his pages. We do not foreclose the possibility that an election official or a trial court reasonably might determine that such conduct, although technically in violation, substantially complied with the statutory requirements.

But this case falls into a second category. There is no plausible claim here that Clarke or Rodney complied

---

[10] We note as well that we generally have articulated the substantial compliance doctrine in contexts in which requiring strict compliance would result in voiding the results of an election, an outcome that courts have hesitated to sanction. For purposes of this appeal, we assume without deciding that the parties are correct that we should have some—if not the same—hesitancy to overturn the expressed preferences of the voters in the petition gathering context.

with the law by some means distinct from, but comparable to, that set forth in the statute. They simply failed to comply. The substantial compliance claim here, rather, is that what is admittedly a clear violation of the statute should not be met with that statute's consequences, because it would be unfair, or because other statutory requirements have been satisfied, or because a full, robust democratic process is alleged to be more important than compliance with relatively picayune mandates. We have continued to reject such claims since we first set forth the substantial compliance doctrine in *State ex rel. Bell* v. *Weed*, supra, 60 Conn. 24. See, e.g., *Cohen* v. *Rossi*, supra, 346 Conn. 680 ("[i]f there is to be [disen]franchisement, it should be because the legislature has seen fit to require it in the interest of an honest suffrage, and has expressed that requirement in unmistakable language" (internal quotation marks omitted)); *Butts* v. *Bysiewicz*, supra, 298 Conn. 689 ("the court cannot invoke its equitable authority to compel the defendant to act in direct contravention [of a] clear legislative mandate"); *Dombkowski* v. *Messier*, supra, 164 Conn. 207 ("[When] the legislature in express terms says that a ballot shall be void for some cause, the courts must undoubtedly hold it to be void; but no voter is to be [disen]franchised on a doubtful construction, and statutes tending to limit the exercise of the ballot should be liberally construed in his favor. Unless a ballot comes clearly within the prohibition of some statute it should be counted . . . ." (Internal quotation marks omitted.)).

To summarize, when a statute sets forth a mandatory requirement in plain and unambiguous terms, and dictates that petitions submitted in violation of that requirement be rejected, we are not free to ignore patent violations of that requirement under the banner of substantial compliance. To do so would be to substitute our judgment for that of the legislature and to determine

that certain statutes are not important enough to demand compliance. That we will not do. See, e.g., *Butts* v. *Bysiewicz*, supra, 298 Conn. 675.

We also disagree with the trial court's determination that Airey did substantially comply with the statutory requirements because "the number of signatures is readily determined by a quick review of the numbered signature pages." At oral argument before this court, Airey's counsel acknowledged that the tallying of verified signatures by each circulator is not a mere technical requirement; rather, it plays an important role in limiting the opportunity for fraud. If, hypothetically, the registrar of voters receives a full page containing twenty signatures but the total number is not certified as required by statute, there is no way to know whether the circulator personally authenticated all twenty signatures or whether, say, fifteen signatures were authenticated and then five additional, unauthenticated signatures were added to the sheet after it was signed by the circulator but before it was filed.

To the extent that it is relevant, the legislative history supports the conclusion that the requirement that the circulator attest to the total number of verified signatures was adopted to prevent fraud of this sort. When the relevant language was added to § 9-410 (c) in 1978; see Public Acts 1978, No. 78-125, § 3; Claire Jacobs, vice chairman of the State Elections Commission, which was one of the entities that had requested that the legislature enact the amendments, explained the rationale as follows: "There are . . . sheets to which names have been added after the circulator has signed and submitted those sheets to a third person for delivery to the registrar. Such fraudulent abuses of the petition process would be severely curtailed . . . ." Conn. Joint Standing Committee Hearings, Elections, 1978 Sess., p. 11.

We thus agree with Green that Feliciano and McGregor were required to reject the five Airey sheets that were

submitted without proper tallies. According to Green's counterclaim, the disqualification of those five sheets will result in the removal of approximately sixty additional signatures, bringing Airey below the minimum 375 needed to appear on the primary ballot. The parties have not briefed the question of how the primary election, which was unilaterally cancelled by Feliciano and McGregor, is to be conducted with both slates disqualified from appearing on the primary ballot. We leave that question to the trial court to resolve on remand.

The judgment is reversed with respect to the five contested sheets of the Airey petition and the case is remanded with direction to order Feliciano and McGregor to reject all signatures on those sheets and, if that results in a total of fewer than 375 verified signatures, to disqualify the Airey slate from the primary ballot for the Democratic Town Committee for the seventh district of the city of Hartford, and for other proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.